John Fellas
Hagit Elul
Sarah Barrett*
*application for admission pending

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000
fellas@hugheshubbard.com

Attorneys for Defendants Dr. Marco Stoffel
and Lauramca Holdings, L.L.C.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VISTRA TRUST COMPANY (JERSEY)
LIMITED AS TRUSTEE OF THE ALSAM;
COLLEEN AND LOGANY SETTLEMENTS;
COLLEEN INVESTMENT AG; ALSAM
HOLDING AG; PENNY ASSET AG;
LOGANY EQUITY AG;
VIERWALDSTATTER BETEILIGUNGEN
AG; CLARICK AG; COLLEEN
INVESTMENT, L.L.C.; LOGANY, L.L.C.;
AND WILLIAM TACON, RECEIVER AND
MANAGER OF THE ASSETS OF
MAYTOWN UNIVERSAL SA AND
PLYMPTON UNIVERSAL SA,

                       Plaintiffs,

       -against-

DR. MARCO STOFFEL; ALBE
ASSOCIATES LIMITED; BLUECOLT
SECURITIES CORPORATION;
LAURAMCA HOLDINGS, L.L.C.; AND
JOHN DOES 1-10,

                 Defendants.

Index No.:  2008 CV- 02844

## DECLARATION OF MR FRANCOIS KNOEPFLER

Neuchâtel, Switzerland

François Knoepfler, pursuant to 28 USC Section 1786, declares as follows:

1.  I am a professor at Law at the University of Neuchâtel, Switzerland, were I specialized in private international law, international commercial arbitration and comparative law. I am also an attorney admitted to practice in the courts of Switzerland. In that regard, I have practiced commercial law for 40 years. I maintain a relationship with the law firm KGG & Associés, located in Neuchâtel.

2.  I have extensive experience in Swiss arbitration, having participated in over 80 international arbitrations and 10 Swiss arbitrations, specifically. I have published extensively on the subject of international arbitration and private international law, including a lot of articles. And I have lectured publicly on the subject of arbitration on several occasions, not only in Switzerland, but also in France and Germany.

3.  A copy of my curriculum-vitae is attached to this affidavit as Exhibit A.


**Preliminary remarks**

I have been asked to give a legal opinion concerning the prima facie test/review made by the Swiss Chambers as set out in art. 3/6 of the Swiss Rules of International Arbitration in a letter of 10 March 2008 by the Arbitration Committee of the Zurich Swiss Chamber.

For that purpose I have been provided with the two letters sent on 5 February 2008 (Exhibit B) and 10 March 2008 by the Arbitration Committee of the Zurich Swiss Chamber (Exhibit C.), and have reviewed the submissions of the Claimants referred to in the 10 March 2008 letter, namely, the Notice of Arbitration (Exhibit D) and Claimants' submission dated 20 February 2008 (Exhibit E).


**A.    Introduction to Article 3(6) of the Swiss Rules of International Arbitration**

1.  The Swiss Rules of International Arbitration ("Swiss Rules") came into force on 1 January 2004. They are based on the UNCITRAL Arbitration Rules, but contain changes and additions reflecting modern practice and comparative law in the field of international arbitration.

2.  Arbitration proceedings under the Swiss Rules are administered by one of the six Chambers of Commerce and Industry of Basel, Bern, Geneva, Ticino, Vaud and Zurich (the "Chambers") acting as arbitral institution.

3.  Article 3 of the Swiss Rules provides the mechanism by which arbitration proceedings under the Swiss Rules are commenced, notably by means of the parties' initial submissions, i.e. the Claimants' Notice of Arbitration and the Respondent's Answer to the Notice of Arbitration.

4.  According to this mechanism, the Swiss Chambers do not transmit a Notice of Arbitration to the Respondent "automatically", i.e. without any preliminary review. Instead, the Chambers conduct an examination of the Notice of Arbitration with respect to the arbitration agreement invoked by the Claimant. The description of the existence of an agreement to arbitrate is one of the essential elements to be included in any Notice or Arbitration filed in compliance with Article 3(3)(c) of the Swiss Rules.

5.  The provision which incorporates the review of the arbitration agreement by the Chambers, **Article 3(6) of the Swiss Rules**,[1] stipulates as follows:

> *The Chambers shall provide without delay a copy of the Notice of Arbitration and of any exhibits included therewith to the Respondent, unless the Chambers decide, after consultation with the Special Committee, that there is manifestly no agreement to arbitrate referring to these Rules.*

6.  Hence, the Chambers not only review the arbitration agreement, but take a **decision** whether or not the arbitration will proceed. According to Article 3(6) of the Swiss Rules, there are two possible scenarios:

    (1) **First Scenario:** the Chambers decide that there is on a prima facie test an arbitration agreement referring to the Swiss Rules and, on that basis, proceed with the arbitration by transmitting the Notice of Arbitration to the Respondent without delay.

    This scenario remains without prejudice to (a) the respondent's right to object to the arbitral tribunal's jurisdiction and (b) the arbitral tribunal's power to rule on its own jurisdiction (*competence-competence*), including on the existence or validity of the arbitration agreement (Article 21 of the Swiss Rules).

    *or*

    (2) **Second scenario:** the Chambers decide, after consultation with the Special Committee, that there is manifestly no arbitration agreement referring to the Swiss Rules.

    In this scenario, the Notice of Arbitration is not transmitted to the Respondent and the arbitration is not set in motion.

---

[1]  Article 3(6) of the Swiss Rules was added to the UNCITRAL Arbitration Rules, which served as a model to the Swiss Rules.

3

**B.      The Purpose of the Swiss Chambers' *prima facie* Jurisdictional Decision**

7.      The Chambers' review of the arbitration agreement serves an important function: it provides a "screening" of the Notice of Arbitration with regard to the existence of a sufficient basis to arbitrate.  This screening constitutes a **special service** offered to the users of Swiss Chambers arbitration.[2]  The advantages are that:

> (1)      where the Chambers accept that there is on a prima facie test an arbitration agreement (*First Scenario*), this decision helps to avoid lengthy state court litigation on jurisdiction, which may be instigated by a resisting respondent and which prevent the arbitration from going forward; and

> (2)      where the Chambers decide that there is no arbitration agreement and the proceedings are not allowed to proceed (*Second Scenario*), their decision helps to avoid lengthy – and futile – proceedings on jurisdiction before the arbitral tribunal itself; without the Chambers decision, there would be a risk that the respondent is obliged to participate in arbitration proceedings, even if there may not even be a semblance of an agreement to arbitrate.

8.      Since the Chambers take the decision pursuant to Article 3(6) of the Swiss Rules within a very short timeframe, it has been recognized as a useful step to "*avoid expenditure of time and money in proceedings dealing with the question of the arbitrators' jurisdiction.*"[3]

9.      This "safeguard" or "gate keeping" thus helps to speed up the arbitration process at its commencement and to prevent duplicative proceedings.[4]  Every arbitral institution has an interest in assisting the parties in resolving their dispute without having to spend avoidable resources on jurisdictional issues.[5]

10.     Besides the Swiss Chambers, other arbitral institutions also provide such a service:

> • Most prominently, Article 6(2) of the ICC Rules of Arbitration provides the following *prima facie* test by the ICC Court of International Arbitration:

---

[2]    PHILIPPE, Les pouvoirs de l'arbitre et de la Cour d'arbitrage de la CCI relatifs à leur compétence, Revue de l'Arbitrage, 3/2006, p. 606.

[3]    Gilliéron/Pittet, in: Zuberbühler/Müller/Habegger (eds.), *Swiss Rules of International Arbitration – Commentary*, Kluwer Law/Schulthess, Zurich etc. 2005, Article 3, N. 12: "A decision stopping the arbitration from the outset will thus be very useful in order to avoid expenditure of time and money in proceedings dealing with the question of the arbitrators' jurisdiction." With respect to Article 6(2) of the ICC Rules of Arbitration, which provides a similar procedure (see below, # 10), CRAIG/PARK/PAULSSON have described the initial screening as "*a useful and important protective device. … The Courts' role under Article 6(2) is an important administrative safeguard against the putting into motion of an arbitration procedure when there is no jurisdictional basis for it whatsoever.*" They described the ICC Court's role as that of a "gate keeper CRAIG/PARK/PAULSSON, International Chamber of Commerce Arbitration, 3rd ed., New York 2000, Ch. 11.02, p. 156 (emphasis added) and p. 160.

[4]    PHILIPPE, Les pouvoirs de l'arbitre et de la Cour d'arbitrage de la CCI relatifs à leur compétence, Revue de l'Arbitrage, 3/2006, pp. 606, 616; CRAIG/PARK/PAULSSON, International Chamber of Commerce Arbitration, 3rd ed., New York 2000, Ch. 11.02, p. 155.

[5]    CRAIG/PARK/PAULSSON, International Chamber of Commerce Arbitration, 3rd ed., New York 2000, Ch. 11.02, p. 158.

> *If the Respondent does not file an Answer, as provided by Article 5, or if any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement, the Court may decide, without prejudice to the admissibility or merits of the plea or pleas, that the arbitration shall proceed if it is prima facie satisfied that an arbitration agreement under the Rules may exist. In such a case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself. If the Court is not so satisfied, the parties shall be notified that the arbitration cannot proceed. In such a case, any party retains the right to ask any court having jurisdiction whether or not there is a binding arbitration agreement.*

- Article 7 of the Rules of the Arbitration Institute of the Stockholm Chamber of Commerce gives the SCC Institute the power to dismiss a Request for Arbitration:[6]

  > *If it is clear that the SCC Institute lacks jurisdiction over the dispute or if the Registration Fee has not been paid in due time, the Claimant's Request for Arbitration shall be dismissed.*

- Further, according to Article 4 of the Arbitration Rules of the Belgian Center for Arbitration and Mediation (CEPANI), the commencement of an arbitration may be blocked in case of a lack of an apparent arbitration agreement:

  > *In the event that there is no apparent arbitration agreement, the arbitration may not proceed should Respondent not answer within the one-month period mentioned in Article 2, or should Respondent refuse arbitration in accordance with the CEPANI Rules.*

  The wording "clear lack of jurisdiction" in the Stockholm Rules and "no apparent arbitration agreement" in the CEPANI Rules is quite similar to the "manifest" lack of an arbitration agreement in Article 3(6) of the Swiss Rules.

11. Given the parallelism and common rationale of these provisions, the general considerations developed with respect to Article 6(2) of the ICC Rules of Arbitration apply also to Article 3(6) if the Swiss Rules.[7]

12. Not all arbitration institutions offer such a screening or selection service. Other institutional arbitration rules leave all issues of jurisdiction entirely to the arbitral tribunal.[8] Under such rules, a request for arbitration is automatically notified to the respondent. Article 7(1) of the Arbitration Rules of the Netherlands Arbitration Institute (NAI) even expressly excludes any examination by the institution:

---

[6] *See* also FRANKE, in: SCHÜTZE (ed.), Institutionelle Schiedsgerichtsbarkeit, Carl Heymans 2006, p. 807, ad Article 7 SCC Rules of Arbitration.

[7] POUDRET/BESSON, Comparative Law of International Arbitration, 2nd ed., Zurich etc. 2007, p. 395, N. 468.

[8] *See* e.g. Article 15(1) of the Arbitration Rules of the American Arbitration Association (AAA/ICDR).

*The Administrator does not examine whether the parties have agreed to arbitration, nor whether they have made the NAI Arbitration Rules applicable. It is up to the arbitral tribunal to decide on a plea by the respondent that (NAI) arbitration was not agreed to (art. 9).*

**C.    The Nature of the Swiss Chambers' *prima facie* Jurisdictional Decision**

13.    First, the Chambers' decision is a **summary decision** taken on the basis of a *prima facie* examination ("manifestly") of the arbitration agreement contained in the Notice of Arbitration. In the case of a positive decision (*First Scenario*), it does not and is not intended to prejudge a ruling by the arbitral tribunal on its jurisdiction.[9]

14.    Second, the institution's decision is discretionary.[10] Even though it may be more difficult for the Chambers (or other arbitral institutions such as the ICC) to decide not to set an arbitration in motion, the decision is taken very seriously.[11] It may also be emphasized that when denying the right to arbitrate under the Swiss Rules (*Second Scenario*), the Chamber will have consulted with the Special Committee. The Special Committee is a committee composed of members designated from among the members of the Arbitration Committee, which is comprised of experienced practitioners of international arbitration.[12]

15.    Third, given that the Chambers are an institution administering arbitral proceedings, the *prima facie* decision is not a judicial, but an **administrative decision**, which is different in character from the arbitrators' decision on their jurisdiction: it is **not capable of appeal** before the state courts.[13]

16.    In the case of a positive *prima facie* jurisdictional decision (*First Scenario*), the final decision on jurisdiction remains with the arbitral tribunal. Such a decision can only be challenged as part of a motion to set aside the arbitral tribunal's final decision on its jurisdiction under the *lex arbitri*.

17.    In the case of a negative decision (*Second Scenario*), however, the decision is **definitive**. Nothing precludes the disappointed claimant from applying for reconsideration of the decision (no *res judicata* effect), but the chances that the Chambers will reverse their

---

[9]    POUDRET/BESSON, Comparative Law of International Arbitration, 2nd ed., Zurich etc. 2007, p. 394, N. 468; DERAINS/SCHWARTZ, A Guide to the ICC Rules of Arbitration, Kluwer Law 2005, p. 80.

[10]    HAUTOT, Les pouvoirs de la Cour d'arbitrage de la C.C.I. de décider ou non d'organiser l'arbitrage, ASA Bulletin, 1990, p. 28.

[11]    *See* e.g. PHILIPPE, Les pouvoirs de l'arbitre et de la Cour d'arbitrage de la CCI relatifs à leur compétence, Revue de l'Arbitrage, 3/2006, p. 607: « *Dans tous les cas, la Cour procède à un examen méticuleux des documents et des arguments des parties pour déterminer le bien-fondé de d'objection et décider s'il y a lieu de permettre la poursuite de la procédure.* »

[12]    *See* para. (e) in the Introduction to the Swiss Rules.

[13]    *See* in particular NATER-BASS, 'Prima Facie' Zuständigkeitsentscheide in internationalen Schiedsgerichtsverfahren aus der Sicht der Parteien, ASA Bulletin 4/2002, p. 612; with respect to Article 6(2) of the ICC Rules of Arbitration, *see* e.g. CRAIG/PARK/PAULSSON, International Chamber of Commerce Arbitration, 3rd ed., New York 2000, Ch. 11.02, pp. 158-161; PHILIPPE, Les pouvoirs de l'arbitre et de la Cour d'arbitrage de la CCI relatifs à leur compétence, Revue de l'Arbitrage, 3/2006, p. 599; FOUCHARD/GAILLARD/GOLDMAN On International Commercial Arbitration, Kluwer Law 1999, N. 979.

decision are slim, unless there are relevant new facts or the circumstances have changed in a way that would justify to nevertheless proceed with the arbitration.[14]

18.  In any event, in light of the administrative nature of the institution's decision, the disappointed party is not deprived of all remedies if it is decided that the arbitration cannot proceed (Second Scenario): it retains the right to ask any court having jurisdiction whether or not there is a binding arbitration agreement.[15]

19.  The Courts have shown considerable respect with regard to the institution's decisions. There have been several cases in different jurisdictions where the claimant attempted to force the institution, in particular the ICC, to put an arbitration in motion by filing an action against it before the state courts.  Such efforts have, however, always remained unsuccessful: the Swiss Federal Tribunal,[16] the *Tribunal de grande instance* and the *Cour d'appel* of Paris,[17] have confirmed the arbitral institution's considerable discretionary power in determining whether an arbitration shall proceed and refused to re-examine the institution's *prima facie* decisions.[18]

### D.  The Impact of the Swiss Chambers' *prima facie* Decision: Jurisdictional Power

20.  Despite its preliminary nature, the significance and authority of the Swiss Chambers' decision to "release" a Notice of Arbitration to the respondent should not be under-estimated:

---

[14]  *See* decision of the *Tribunal de grande instance de Paris* dated 8 October 1986, Rev. arb. 1987, p. 367 (*Ceskilovenska Obchodni Banka A.S. (Cekobanka)* v. *Chambre de commerce internationale*); DERAINS/SCHWARTZ, A Guide to the ICC Rules of Arbitration, Kluwer Law 2005, p. 81.

[15]  *See* last sentence in Article 6(2) of the ICC Rules of Arbitration.  The same applies to cases of negative decisions under the Swiss Rules; CRAIG/PARK/PAULSSON, International Chamber of Commerce Arbitration, 3rd ed., New York 2000, Ch. 11.01, p. 155; PHILIPPE, Les pouvoirs de l'arbitre et de la Cour d'arbitrage de la CCI relatifs à leur compétence, Revue de l'Arbitrage, 3/2006, p. 599.

[16]  *See* non-published decision of the Swiss Federal Tribunal dated 18 May 1993 (confirmed in Swiss Federal Tribunal decision 118 II 361, cons. 3b), ASA Bulletin 1984, pp. 203 et seq.; *see* NATER-BASS, 'Prima Facie' Zuständigkeitsentscheide in internationalen Schiedsgerichtsverfahren aus der Sicht der Parteien, ASA Bulletin 4/2002, pp. 611-618.

[17]  *Ceskilovenska Obchodni Banka A.S. (Cekobanka)* v. *Chambre de commerce internationale*, decision of the *Tribunal de grande instance de Paris* dated 8 October 1986, Rev. arb. 1987, p. 367 (see also HAUTOT, Les pouvoirs de la Cour d'arbitrage de la C.C.I. de décider ou non d'organiser l'arbitrage, ASA Bulletin, 1990, pp. 12-20); *R.E.D.E.C. et Pharaon* v. *Uzinexport Import et Chambre de commerce internationale*, decision of the *Tribunal de grande instance de Paris* dated 13 July 1988, Rev. arb. 1989, p. 97; *Japan Time* v. *Kienzle France*, decision of the *Cour d'appel de Paris* dated 11 July 1980 (unpublished, but referred to by CRAIG/PARK/PAULSSON, International Chamber of Commerce Arbitration, 3rd ed., New York 2000, Ch. 11.02, p. 161, FN. 17); *Société BIC SA* v. *Chambre de commerce internationale*, decision of the Cour d'appel de Paris dated 28 February 2001, *Rev. arb.* 2001, p. 236. *See* also ROBINE, The Liability of Arbitrators and Arbitral Institutions in International Arbitrations under French Law, Arbitration International, Vol. 5 No. 4 (1989), p. 328; PHILIPPE, Les pouvoirs de l'arbitre et de la Cour d'arbitrage de la CCI relatifs à leur compétence, Revue de l'Arbitrage, 3/2006, p. 604-605; DERAINS/SCHWARTZ, A Guide to the ICC Rules of Arbitration, Kluwer Law 2005, p. 85.

[18]  POUDRET/BESSON, Comparative Law of International Arbitration, 2nd ed., Zurich etc. 2007, p. 395, N. 468.

(1)  In the **First Scenario**, the decision is momentous for two reasons.

- First, it sets arbitration proceedings in motion, with all the consequences this entails for the parties: the Respondent is asked to submit an Answer to the Notice of Arbitration, an arbitral tribunal is constituted, receives the file and begins with the conduct of the arbitration. The Chambers' decision to transmit the Notice of Arbitration to the Respondents thus entails important expenditures of time and money, even if the arbitral tribunal, once constituted, should eventually come to the conclusion that it has no jurisdiction.[19] When deciding to "release" an arbitration the Chambers must therefore be quite convinced that there might be, at least on a prima facie test, a valid arbitration agreement.   Otherwise, they would risk engaging the parties in costly proceedings which could turn out to be in vain.

- Second, the experience of the ICC shows that arbitral tribunals rarely decline their jurisdiction once they have received the file.[20]  In practice, this first administrative screening of the existence prima facie of the arbitration clause constitutes an important indication of the positive decision of the Arbitral Tribunal on its jurisdiction.

- In the **Second Scenario**, the consequences of the decision are equally far-reaching, but in a different manner.  The decision *not* to transmit the Notice of Arbitration to the Respondent effectively disposes of the Claimant's right to bring an arbitration administered by one of the Swiss Chambers.  As pointed out above, such a decision is *final* because it cannot be appealed. As set out above, the disappointed claimant retains the right to ask any court having jurisdiction whether or not there is a binding arbitration agreement.  The competent court is determined by the lex arbitrae.

21.  The Swiss Chambers' **jurisdictional powers** in their administrative role appear even more pronounced than the powers of the ICC Court of Arbitration under Article 2(6) of the ICC Rules of Arbitration, the ICC Court proceeds with its discretionary *prima facie* examination of the arbitration agreement only, or at least primarily, if

(a)  "the Respondent does not file an Answer"; or

(b)  "any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement".[21]

---

[19]  This decision may be taken only in the final award (Art. 21(4) of the Swiss Rules), i.e. at the very end of long and costly proceedings.

[20]  *See* PHILIPPE, Les pouvoirs de l'arbitre et de la Cour d'arbitrage de la CCI relatifs à leur compétence, Revue de l'Arbitrage, 3/2006, p. 614.

[21]  DERAINS/SCHWARTZ, A Guide to the ICC Rules of Arbitration, Kluwer Law 2005, p. 80; POUDRET/BESSON, Comparative Law of International Arbitration, 2nd ed., Zurich etc. 2007, p. 394, N. 468; CRAIG/PARK/PAULSSON, International Chamber of Commerce Arbitration, 3rd ed., New York 2000, Ch. 11.02, p. 158: "*Even if there is an evident jurisdictional difficulty, the Request is invariably sent to the respondent to*

Consequently, if the Respondent files an Answer within the set time limit and none of the parties raises a plea with respect to the arbitration agreement, an arbitration may be set in motion although there is no ICC arbitration agreement. In case the Respondent then raises jurisdictional objections before the arbitral tribunal and this tribunal decides to decline its jurisdiction in the final award,[22] the entire arbitration may have been futile.

Article 3(6) of the Swiss Rules, conversely, does not contain any triggering requirements: the Swiss Chambers **decide** *sua sponte*, i.e. their mission is systematic and exists independently from another procedural circumstance.[23] Therefore the wording used by the Swiss Rules is very specific. The Swiss Rules do not simply authorise or empower the Swiss Chambers to conduct a *prima facie test*: the Swiss Chambers have the duty to check whether there is or not an arbitration clause. As a result, clear cases of a lack of an arbitration agreement are separated out at the very outset of the proceedings. Therefore, the burden on the Swiss Chambers and the significance of their screening and decision making appear still more significant than the review of the ICC International Court of Arbitration.

## E.    Conclusion

22.    Under Article 3(6) of the Swiss Rules, the Chambers have an important mission to fulfil, to provide an effective safeguard to ensure that the parties do not waste their time and money resources in futile proceedings on jurisdiction before the state courts or before the arbitral tribunal.

23.    The Chambers' positive decision to transmit the Notice of Arbitration to the respondent (*First Scenario*) constitutes *prima facie* evidence and thus an indication to the arbitral tribunal that there is *a priori* no concern with regard to a lack of an arbitration agreement referring to the Swiss Rules.

24.    Once the file is sent to the arbitral tribunal, it may entertain objections to its jurisdiction. It is worth noting that Art. 186 of the Swiss Private International Law Act (SPILA) provides that the arbitral tribunal has the power, without reservation, to decide upon its own jurisdiction. Art. 186 / 1 provides the following: *The Arbitral Tribunal shall itself decide on its jurisdiction*. This clause expressed the widely recognized principle in international arbitration of "Kompetenz-Kompetenz"(This is for instance the case in France, Germany, Spain, Portugal, Greece, Belgium). "Commentators are unanimous that this norm is mandatory, so that the parties cannot deprive the arbitral tribunal of the power and confer it on another authority, be it an institution or a court".[24] This principle is a corollary to the principle of the autonomy/separability of the arbitration

---

*elicit a response. After all, that response may turn out to constitute an unqualified acceptance of ICC arbitration.*"

22    DERAINS/SCHWARTZ, A Guide to the ICC Rules of Arbitration, Kluwer Law 2005, pp. 81, 104.

23    *See* Gilliéron/Pittet, in: Zuberbühler/Müller/Habegger (eds.), *Swiss Rules of International Arbitration – Commentary*, Kluwer Law/Schulthess, Zurich etc. 2005, Article 3, N. 12.

24    Jean-Francois Poudret/Sebastien Besson, Comparative Law of International Arbitration, sec. ed. 2007, no 462.

clause. Whenever parties enter into an arbitration agreement that specifies Switzerland as the place of arbitration, therefore, they are agreeing to the mandatory application of Article 186, providing that arbitrators have jurisdiction to determine their own jurisdiction.

25.   The Swiss Rules, which govern the arbitration agreements relied on by Claimant (providing for arbitration in Zurich, with Swiss Law applicable) also contain a clause expressing the same principle:

> "**Article 21** *PLEAS AS TO THE JURISDICTION OF THE ARBITRAL TRIBUNAL*
> 1.   *The arbitral tribunal shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the existence or validity of the arbitration clause or of the separate arbitration agreement*
> 2.   *The arbitral tribunal shall have the power to determine the existence or the validity of the contract of which an arbitration clause forms a part. For the purposes of Article 21, an arbitration clause which forms part of a contract and which provides for arbitration under these Rules shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitral tribunal that the contract is null and void shall not entail ipso jure the invalidity of the arbitration clause.*
> 3.   *As a rule, a plea that the arbitral tribunal does not have jurisdiction shall be raised in the answer to the Notice of Arbitration, but in no event later than in the Statement of Defence referred to in Article 19, or, with respect to a counterclaim, in the reply to the counterclaim.*
> 4.   *In general, the arbitral tribunal should rule on a plea concerning its jurisdiction as a preliminary question. However, the arbitral tribunal may proceed with the arbitration and rule on such a plea in its final award.*"

The arbitral tribunal's award on jurisdiction may be set aside by the Swiss Federal Tribunal (art. 190/2 SPILA).  Moreover, if a Swiss court is first seized instead of an arbitral tribunal, the court will decline jurisdiction in favour of the arbitral tribunal within the boundaries of art. 7 SPILA; the Swiss Federal Tribunal ruled the following: (translation) "if the state judge is seized with an objection based upon arbitration and the arbitral tribunal has its seat in Switzerland, the judge will limit himself/herself to a summary examination of the existence prima facie of the arbitration clause so not to jeopardize the decision of Arbitral tribunal on his own jurisdiction".[25] This judgement means that the court will refrain from going into the examination of witnesses and other evidence; this is and remains the duty of the arbitral tribunal.

26.   When parties agree upon an arbitration clause referring to the Swiss Rules of International Arbitration, they thereby entrust the Chambers with certain decision-making powers that are of an administrative nature, but nonetheless have been respected by the courts, as is by several cases dealing with an institution's negative decision (*Second Scenario*).

---

[25]   DTF 122 III 139, with note F. Knoepfler in Revue Suisse de droit international et européen, 1996, p. 586; also DTF 121 III 38 RSDIE, 1996, p. 121; YCA 1996, 690 Switz.27.

I declare under penalty of perjury that the foregoing is true and correct

Executed this 25 day of March, 2008 in Neuchâtel, Switzerland

_____

Francois Knoepfler

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VISTRA TRUST COMPANY (JERSEY) LIMITED AS TRUSTEE OF THE ALSAM; COLLEEN AND LOGANY SETTLEMENTS; COLLEEN INVESTMENT AG; ALSAM HOLDING AG; PENNY ASSET AG; LOGANY EQUITY AG; VIERWALDSTATTER BETEILIGUNGEN AG; CLARICK AG; COLLEEN INVESTMENT, L.L.C.; LOGANY, L.L.C.; AND WILLIAM TACON, RECEIVER AND MANAGER OF THE ASSETS OF MAYTOWN UNIVERSAL SA AND PLYMPTON UNIVERSAL SA, | Index No.: 08 CV 02844 |
| Plaintiffs, | |
| -against- | |
| DR. MARCO STOFFEL; ALBE ASSOCIATES LIMITED; BLUECOLT SECURITIES CORPORATION; LAURAMCA HOLDINGS, L.L.C.; AND JOHN DOES 1-10, | |
| Defendants. | |

# EXHIBIT A

## TO

**DECLARATION OF FRANÇOIS KNOEPFLER IN SUPPORT OF
DR. MARCO STOFFEL AND LAURAMCA HOLDINGS, L.L.C.S'
SUPPLEMENTAL MEMORANDUM OF LAW
IN FURTHER SUPPORT OF MOTION TO DISMISS**

*François Knoepfler*
Docteur en droit
Professeur extraordinaire de droit international
privé et de droit comparé

**Adresse**
Rue de la Serre 4
2000 Neuchâtel
Tél.: +41 32 724 35 22
Fax: +41 32 725 01 29
E-mail: knoepfler@kgg.ch



**Formation**
- Licence en droit Université de Neuchâtel (1963)
- Brevet d'avocat Neuchâtel (1965)
- Max Planck Institut Hambourg (1966)
- Docteur en droit Université de Neuchâtel (1967)
- Centre d'études et de recherches Académie de droit international de La Haye (1973)

*Expérience professionnelle*

Avocat KGG depuis 1967

- Professeur de droit international privé à l'Université de Neuchâtel, depuis 1972 (cours général et cours d'arbitrage commercial international)
- Membre de la Commission fédérale d'experts pour la codification du droit international privé (1973-1978)
- Professeur de droit civil comparé, Université de Neuchâtel, depuis 1973 (Common Law)
- Délégué suisse à l'UNCITRAL pour la codification du droit de l'arbitrage international, New York - Vienne (1983-1985)
- Doyen de la Faculté de droit de l'Université de Neuchâtel (1986-1987)
- Bâtonnier de l'Ordre des Avocats du canton de Neuchâtel (1987-1988)
- Président de la Société suisse de droit International (1990-1996)
- Visiting Fellow Cambridge, Wolfson College (1992)
- Pratique de l'arbitrage commercial international (président dans 37 causes, arbitre unique dans 4 causes, coarbitre dans 15 causes et également conseil de parties)
- Médiateur dans les litiges intervenant entre Expo 02 et les partenaires contractuels de celle-ci.

*Associations professionnelles et scientifiques*

- Membre du Comité de l'Association suisse de l'arbitrage, ASA
- Membre du Comité de la Société suisse de droit international (SSDI)
- Membre du Comité d'arbitrage de l'OMPI
- Fédération suisse des avocats
- Ordre des avocats neuchâtelois
- International Law Association
- London Court for international Arbitration

*Articles*

- Droit de l'informatique : Conséquences sur le droit international privé, Neuchâtel 2001. (avec Bertil Cottier, Nathalie Tissot, Michel Jaccard)

- Les mesures provisoires peuvent-elles être rendues sous forme de sentence arbitrale ? In Mélanges en l'honneur de Henri-Robert Schüpbach, Bâle 2000.

- Les contrats spéciaux dans la LDIP, Fiches juridiques suisses N° 242 A et 242 B, Genève 1997, Naissance de la litispendance: l'articulation de la Convention de Lugano et du droit fédéral (art. 21 CL, 9 LDIP et 136 nCC), in Roland Ruedin (édit.), Mélanges en l'honneur de Carlo Augusto Cannata, Collection neuchâteloise, Bâle/Francfort 1999, p. 383-396 (avec Simon Othenin-Girard)

- Réflexions sur la théorie des faits doublement pertinents, in AJP 1998, p. 787-791.

- Corruption et arbitrage international, Mélanges en l'honneur de François Dessemontet, CEDIDAC, Lausanne 1998.

- Les mesures provisoires et l'arbitrage international, in Schiedsgerichtsbarkeit, Europa Institut Zürich, A. Kellerhals (édit.), Zürich 1997, p. 307-329.

- La Convention de Lugano au soir du 31 décembre 1999, in De la Constitution, Etudes en l'honneur de Jean-François Aubert, Bâle et Francfort-sur-le Main 1996, p. 531-541

- Le contrat international, Fiches Juridiques suisses N° 242, Genève 1996 (avec Simon Othenin-Girard)

- Law of Persons, in Introduction to Swiss Law, 2e éd., Kluwer 1995, p. 47 ss (avec Carole Zulauf)

- Que reste-t-il de l'autonomie de la volonté en matière de bail immobilier international ?, in Rechtskollisionen, Festschrift für Anton Heini, Zurich 1995, p. 239-256

- L'article 19 LDIP est-il adapté à l'arbitrage international ? in Etudes de droit international en l'honneur de Pierre Lalive, Genève 1993, p. 531-541

- Note à l'arrêt Fincantieri-Cantieri Navali c/ M., in Revue de l'Arbitrage 1993 No 4, p. 695-703

- La House of Lords et la définition de la matière "civile et commerciale", in Mélanges en l'honneur de Jacques-Michel Grossen, Neuchâtel 1992, p. 9-18

- Jurisprudence suisse en matière d'arbitrage international, in Revue suisse de droit international et de droit européen, vol. 3, Zurich 1991, p. 325-376; vol. 2, Zurich 1993, p.183-216; vol. 1, Zürich 1994, p.103-172; vol. 4, Zürich 1995, p. 1-42; vol. 4, Zürich 1996, p. 539-591; vol. 5, Zürich 1997, p. 587-636; vol. 4, Zürich 1998, p. 553-614 ; vol. 4/5, Zürich 1999, p. 575-638; vol. 4, Zürich 2000, p. 559-626.

- Les accords de joint venture et les limites du droit international privé, in Conflits et harmonisation, Mélanges en l'honneur d'Alfred E. von Overbeck, Fribourg 1990, p. 747-768 (avec Olivier Merkt)

- Commentaire d'arrêts sur le droit du bail dans "Droit du bail", publication annuelle dès 1989, dernière édition 13/2001.

- Making of Awards and Termination of Proceedings, in Essays on International Commercial Arbitration, Graham & Trotman / Martinus Nijhoff, Londres 1989, p. 160-176 (avec Philippe Schweizer)

- Tchernobyl, Action ouverte en Suisse, for et droit applicable, in Pollution transfrontière : Tchernobyl/Schweizerhalle, Beihefte zur Zeitschrift für Schweizerisches Recht, Heft 9, Bâle 1989, p. 33-53

- Le commerce de l'art en droit international privé suisse, in Aspects juridiques du commerce international de l'art, Colloque, Genève/Paris 1988, p. 359-387

- La partie générale de la Loi fédérale de droit international privé, RCDIP 1988, p. 207-235 (avec Philippe Schweizer)

- Le contrat dans le nouveau droit international privé suisse, Journées du CEDIDAC 1987, Lausanne 1988

- Le contrat dans le nouveau droit international privé suisse, in Recueil de jurisprudence neuchâteloise 1987, p. 11-39

- Règles de conflit et "justice matérielle" en droit de la famille, in Recueil de travaux publiés à l'occasion du Congrès de la Société Suisse des Juristes 1987 à Neuchâtel, 1987, p. 93 ss (avec Philippe Schweizer)

- La loi fédérale sur le droit international privé du 18 décembre 1987 (LDIP), Partie générale de la LDIP, in Fiches juridiques suisses, Genève 1992, Nos 237-241

- Nouveau droit du mariage, in Revue de l'état civil 1986, p. 221-232

- L'arbitrage international et les voies de recours, A propos du projet de Loi fédérale sur le DIP, in Mélanges Guy Flattet, Lausanne 1985, p. 491 ss (avec Philippe Schweizer)

- De 1984 à 1990, avec C. Dubler, auteur d'un "Aperçu des publications suisses en matière de droit international privé", in Annuaire suisse de droit international

- Le logement et le propriétaire, rapport suisse à la session des Journées mexicaines de l'Association Henri Capitant, Paris 1984, p. 703 ss

- Les mesures provisoires et l'arbitrage, in Recueil de travaux suisses sur l'arbitrage international, à l'occasion du Congrès intérimaire du ICCA, Lausanne 1984, p. 221 ss (avec Philippe Schweizer)

- Le mandat, Fiches juridiques suisses Nos 326 à 328a, Genève 1983

- Les nationalisations françaises face à l'ordre juridique suisse, in Annuaire suisse de droit international 1983, p. 149 ss

- L'article 7h LRDC est-il interprété conformément à la ratio legis ? in Mélanges Frank Vischer, Zurich 1983, p. 189 ss

- Utilité et dangers d'une clause d'exception en droit international privé, in Hommage à Raymond Jeanprêtre, Neuchâtel 1982, p. 113 ss

- La protection de l'enfant en droit de la famille, Rapport suisse à la session du Caire de l'Association Henri Capitant, Paris 1981, p. 209 ss

- Note à l'arrêt du Tribunal fédéral en la cause S., RCDIP 1981, p. 296 ss

- Le projet de loi fédérale sur le droit international privé helvétique, RCDIP 1979, p. 31 ss

- Le contrat de bail, Fiches juridiques suisses Nos 357 à 362, Genève 1979

- Commentaire de la Loi fédérale du 25 juin 1976 relative au droit de la filiation internationale (art. 8d - 8c LRDC), RCDIP 1978, p. 187 ss

- Le nom et quelques autres questions de l'état civil en droit international privé suisse, aujourd'hui et demain, in Revue de l'état civil 1978/No 11, p. 305 ss

- Le droit international privé : froideur mécanique ou justice casuistique, in Conférences universitaires, Neuchâtel 1976, p. 1 ss

- Note à l'arrêt du Tribunal fédéral en la cause Paiano, RCDIP 1976, p. 619 ss

- Commentaire de la Loi fédérale du 30 juin 1972 relative à l'adoption internationale (art. 8a - 8c LRDC), in Revue critique de droit international privé (RCDIP) 1974, p. 173 ss

*Ouvrages généraux*
- Droit international privé suisse, Précis de droit Stämpfli, Berne 1990, 336 pages, 2e édition, Berne 1995, 461 pages (avec Philippe Schweizer)

- Répertoire de droit international privé suisse, t. 3, Les principales conventions d'établissement touchant le droit international privé, avec Bernard Dutoit, Pierre Lalive, Pierre Mercier, Berne 1986

- Répertoire de droit international privé suisse, t. 2 : Les conventions bilatérales sur les conflits de juridictions, la reconnaissance et l'exécution des jugements étrangers, avec Bernard Dutoit, Pierre Lalive, Pierre Mercier, Berne 1983

- Répertoire de droit international privé suisse, t. 1, Le contrat international, l'arbitrage international, avec Bernard Dutoit, Pierre Lalive, Pierre Mercier, Berne 1982

-   Les nouvelles conventions de La Haye de droit international privé :
    étude de leurs clauses d'adhésion et de leur rôle de lois-modèles,
    Thèse Neuchâtel 1968

# Certified
# Translation

*François Knoepfler*
Doctor of law
Special professor of International Private Law and of Comparative Law.

Address
Rue de la Serre 4
2000 Neuchâtel
Tel : +41 32 724 35 22
Fax : +41 32 725 01 29
E-mail : knoepfler@kgg.ch

Training

- Law license University of Neuchâtel (1963)

- Called to the Bar Neuchâtel (1965)

- Max Planck Institute Hamburg (1967)

- Doctorate in law University of Neuchâtel (1967)

- Center for studies and research of the Hague Academy of international law (1973)

Professional experience

Lawyer at KGG since 1967

- Professor of international private law at the University of Neuchâtel since 1972 (general courses and courses in International commercial arbitration)

- Member of the Federal Commission of Experts for the codification of private international law (1973-1978)

- Professor of comparative common law, University of Neuchâtel, since 1973

- Swiss delegate to UNCITRAL for the codification of international arbitration law, New York – Vienna (1983-1985)

- Dean of the Faculty of Law of the University of Neuchâtel (1986-1987)

- Leader of the *Ordre des Avocats* of the township of Neuchâtel (1987-1988)

- President of the Swiss society of International law (1990-1996)

- Visiting Fellow Cambridge, Wolfson College (1992)

- Practice of international commercial arbitration ( president in 37 cases, sole arbitrator in 4 cases, co-arbitrator in 15 cases and also advisor to the parties)

- Mediator in litigation between Expo 02 and their contractual partners.

Professional and scientific associations

- Member of the committee *l'Association suisse de l'arbitrage, ASA* (Swiss Arbitration Association)

- Member of the committee *Société suisse de droit international* (Swiss society of international law)

- Member of the arbitration committee of WIPO

- Swiss federation of lawyers

- Order of lawyers of Neuchâtel

- International Law Association

- London Court for international Arbitration

Articles

– *Droit de l'informatique : Conséquences sur le droit international privé*, [Computer law : consequences to international private law] Neuchâtel 2001. (with Bertil Cottier, Nathalie Tissot, Michel Jaccard)

– *Les mesures provisoires peuvent-elles être rendues sous forme de sentence arbitrale ?* [Can interim relief be provided in the form of an arbitration award?], In Mélanges en l'honneur by Henri-Robert Schüpbach, Bâle 2000

– *Les contrats spéciaux dans la LDIP* [Special contracts in the LDIP], Fiches juridiques suisses No. 242 A and 242 B, Geneva 1997, *Naissance de la litispendance : l'articulation de la Convention de Lugano et du droit fédéral* [The birth of lis pendens : articulation of the Lugano convention and of federal law](art. 21 CL, 9 LDIP and 136 nCC), in Roland Ruedin (edit.), Mélanges en l'honneur de Carlo Augusto Cannata, Collection neuchâteloise, Bâle/Frankfurt 1999, pp. 383-396 (with Simon Othenin-Girard)

– *Réflexions sur la théorie des faits doublement pertinents* [Reflections on the theory of doubly relevant facts], in AJP 1998, pp. 787-791

– *Corruption et arbitrage international* [Corruption and international arbitration], Mélanges en l'honneur de François Dessemontet CEDIDAC, Lausanne 1998

– *Les mesures provisoires et l'arbitrage international* [Interim relief and international arbitration] in Schiedsgerichtsbarkeit, Europa Institut Zürich, A. Kellerhals (edit.), Zürich 1997, pp. 307-329

– *La Convention de Lugano au soir du 31 décembre 1999*[The Lugano convention on the evening of December 31, 1999], in De La Constitution, Etudes en l'honneur de Jean-François Aubert, Bâle et Francfort-sur-le-main 1996, p. 531-541

– *Le contrat international* [The international contract], Fiches Juridiques suisses No. 242, Geneva 1996 (with Simon Othenin-Girard)

– Law of Persons, in Introduction to Swiss Law, 2nd ed., Kluwer 1995, p.47 et seq. (with Carole Zulauf)

– *Que reste-t-il de l'autonomie de la volonté en matière de bail immobilier international?* [What remains of the autonomy of will in the matter of international real estate leases], in Rechtskillisionen, Festschrift für Anton Heini, Zurich 1995, pp. 239-256

– *L'article 19 LDIP est-il adapté à l'arbitrage international?* [Is article 19 of the LDIP suited to international arbitration?], in Etudes de droit international en l'honneur de Pierre Lalive, Geneva 1993, pp. 531-541

– *Note à l'arrêt Fincantieri-Cantieri Navali c/M* [Case note Fincantieri-Cantieri Navali c/M], in Revue de l'Arbitrage 1993 no. 4, pp. 695-703

– *La House of Lords et la définition de la matière « civile et commerciale »* [The House of Lords and the definition of the "civil and commercial" matter], in Mélanges en l'honneur de Jacques-Michel Grossen, Neuchâtel 1992, pp. 9-18

– *Jurisprudence suisse en matière d'arbitrage international* [Swiss jurisprudence in the matter of international arbitration], in Revue suisse de droit international et de droit européen, vol. 3, Zurich 1991, pp. 325-376; vol. 2, Zurich 1993, pp. 183-216; vol. 1, Zurich 1994, pp. 103-172; vol. 4, Zurich 1995, pp. 1-42; vol. 4 Zurich 1998, pp. 553-614; vol. 4/5, Zurich 1999, pp. 575-638; vol. 4, Zurich 2000, pp. 559-626

– *Les accords de joint venture et les limites du droit international privé* [Joint venture agreements and the limits of international private law], in Conflits et harmonisation, Mélanges en l'honneur d'Alfred E. von Overbeck, Fribourg 1990, pp. 747-768 (with Olivier Merkt)

– *Commentaires d'arrêts sur le droit du bail* [Case comments on lease law] in « Droit du bail », publication annuelle dès 1989, dernière édition 13/2001

– Making of Awards and Termination of Proceedings, in Essays on international Commercial Arbitration, Graham & Trotman / Martinus Nijhoff, London 1989, pp. 160-176 (with Philippe Schweizer)

– *Tchernobyl, Action ouverte en Suisse, for et droit applicable* [Chernobyl, legal action open in Switzerland, applicable place of jurisdiction and law],in Pollution transfrontière : Tchernobyl/Schweizerhalle, Beihefte zur Zeitschrift für Schweizerisches Recht, Heft 9, Bâle 1989, pp. 33-53

– *Le commerce de l'art en droit international privé Suisse* [The art commerce in Swiss international private law], in Aspects juridiques du commerce international de l'art, Colloque, Geneva/Paris 19888, pp. 359-387

– *La partie générale de la Loi fédérale de droit international privé* [The general part of the federal law on international private law] RCDIP 1988, pp. 207-235 (with Philippe Schweizer)

– *Le contrat dans le nouveau droit international privé suisse* [The contract in the new Swiss international private law], Journées du CEDIDAC 1987, Lausanne 1988

- *Le contrat dans le nouveau droit international privé suisse* [The contract in the new Swiss international private law], in Recueil de jurisprudence neuchâteloise 1987, pp. 11-39

- *Règles de conflit et « justice matérielle » en droit de la famille* [Rules of conflict and "material justice" in family law], in a digest of works published for the Congrès de la Société Suisse des Juristes 1987 at Neuchâtel, 1987, p. 93 (with Philippe Schweizer)

- La loi fédérale sur le droit international privé du 18 décembre 1987 (LDIP) [Federal law on international private law of the December 18, 1987 (LDIP)], in Fiches juridiques suisses, Geneva 1992, Nos. 237-241

- *Nouveau droit du mariage* [New marriage law], in Revue de l'état civil 1986, pp. 221-232

- *L'Arbitrage international et les voies de recours, A propos du projet de Loi fédérale sur le DIP* [International arbitration and the right of review, concerning the federal law project on the DIP], in Mélanges Guy Flattet, Lausanne 1985, p. 491 et seq. (with Philippe Schweizer)

- From 1984 to 1990 with C. Dubler, author of a *"Aperçu des publications suisses en matière de droit international privé"* [Overview of Swiss publications on international private law], in Annuaire suisse de droit international

- *Le logement et le propriétaire, rapport suisse à la session des Journées mexicaines de l'association Henri Capitant* [Housing and the owner, Swiss report at the Mexican days session of the Henri Capitant association], Paris 1984, p. 703 et seq.

- *Les mesures provisoires et l'arbitrage* [Interim relief and arbitration], in a digest of Swiss works on international arbitration at the Interim convention of the ICCA, Lausanne 1984, p. 221 et seq. (with Philippe Schweizer)

- *Le mandat* [The mandate], Fiches juridiques suisses [Swiss legal files] nos. 326 to 328a, Geneva 1983

- *Les nationalisations françaises face à l'ordre juridique suisse* [French nationalization with regards to the Swiss legal order], in Annuaire suisse de droit international 1983, p. 149 et seq.

- *L'article 7h LRDC est-il interprété conformément à la ratio legis ?* [Is article 7h of the LRDC being interpreted pursuant to the ratio legis?], in Mélanges Frank Vischer, Zurich 1983, p. 189 et seq.

- *Utilité et dangers d'une clause d'exception en driot internationale privé* [Use and dangers of an exception clause in international private law] in Hommage à Raymond Jeanprêtre, Neuchâtel 1982, p. 113 et seq.

- *La protection de l'enfant en droit de la famille* [Child protection in family law], Swiss report at the Cairo session of the Henri Capitant association, Paris 1981, p. 209 et seq.

- Case notes to the federal court in the case of S., RCDIP 1981, p. 296 et seq.

- The federal law project concerning Greek international private law, RCDIP 1979, p. 31 et seq.

- *Le contrat de bail* [The lease contract], Fiches juridiques suisses nos. 357 to 362, Geneva 1979

- Comment to the Federal law of June 25, 1976 concerning international parentage law (art. 8d – 8c LRDC), RCDIP 1978, p. 187 et seq.

- *Le nom et quelques autres questions de l'état civil en droit international privé Suisse, aujourd'hui et demain* [Names and other questions of marital status in Swiss international private law, today and tomorrow], in Revue de l'état civil 1978/no. 11, p. 305 et seq.

- *Le droit international privé : froideur mécanique ou justice casuistique* [international private law : mechanical coldness or case by case justice], in Conférences universitaires, Neuchâtel 1976, p. 1 et seq.

- Case notes to the federal court in the Paiano case, RCDIP 1976, p. 619 et seq.

- Comment of the federal law of June 30, 1972 regarding international adoption (art. 8a – 8c LRDC), in Revue critique de droit international privé (RCDIP) 1974, p. 173 et seq.

General works

- *Droit international privé Suisse, Précis de droit Stämpfli* [Swiss international private law, Stämpfli law synopsis ], Bern 1990, 336 pages, 2nd edition, Bern 1995, 461 pages (with Philippe Schweizer)

- *Répertoire de droit international privé suisse, t. 3, Les principales conventions d'établissement touchant le droit international privé* [Directory of Swiss international private law, t.3, the principal conventions concerning international private law] avec Bernard Dutoit, Pierre Lalive, Pierre Mercier, Bern 1986

- *Répertoire de droit international privé suisse, t.2 : Les conventions bilatérales sur les conflits de juridiction, la reconnaissance et l'exécution des jugements étranger* [Directory of Swiss international private law, t. 2 : Bilateral agreements concerning jurisdiction conflicts and the acknowledgement and execution of foreign judgments], with Bernard Dutoit, Pierre Lalive, Pierre Mercier, Bern 1983

- *Répertoire de droit international privé suisse, t. 1, Le contrat international, l'arbitrage international* [Directory of Swiss international private law, t. 1, The international contract, international arbitration], with Bernard Dutoit, Pierre Lalive, Pierre Mercier, Bern 1982

– *Les nouvelles conventions de la Haye de droit international privé : étude de leur clauses d'adhésion et de leur rôle de loi-modèles* [The new Hague conventions on international private law : study of their accession provisions and of their role as model-laws] Thesis Neuchâtel 1968



**TRANSPERFECT**

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PORTLAND
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC

City of New York, State of New York, County of New York

I, Marina Yoffe, hereby certify that the document "François Knoepfler" is, to the best of my knowledge and belief, a true and accurate translation from French into English.

Marina Yoffe

Sworn to before me this
28th day of February, 2008

Signature, Notary Public

Katharine L. Perakis
Notary Public - State of New York
No. 01PE5121423
Qualified in QUEENS County
Commission expires on JAN 28, 2012

Stamp, Notary Public

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VISTRA TRUST COMPANY (JERSEY)
LIMITED AS TRUSTEE OF THE ALSAM;
COLLEEN AND LOGANY SETTLEMENTS;
COLLEEN INVESTMENT AG; ALSAM
HOLDING AG; PENNY ASSET AG;
LOGANY EQUITY AG;
VIERWALDSTATTER BETEILIGUNGEN
AG; CLARICK AG; COLLEEN
INVESTMENT, L.L.C.; LOGANY, L.L.C.;
AND WILLIAM TACON, RECEIVER AND
MANAGER OF THE ASSETS OF
MAYTOWN UNIVERSAL SA AND
PLYMPTON UNIVERSAL SA,

Index No.: 08 CV 02844

Plaintiffs,

-against-

DR. MARCO STOFFEL; ALBE
ASSOCIATES LIMITED; BLUECOLT
SECURITIES CORPORATION;
LAURAMCA HOLDINGS, L.L.C.; AND
JOHN DOES 1-10,

Defendants.

---

# EXHIBIT B

## TO

**DECLARATION OF FRANÇOIS KNOEPFLER IN SUPPORT OF
DR. MARCO STOFFEL AND LAURAMCA HOLDINGS, L.L.C.S'
SUPPLEMENTAL MEMORANDUM OF LAW
IN FURTHER SUPPORT OF MOTION TO DISMISS**

**SWISS CHAMBERS' ARBITRATION**

Chambers of Commerce    Basel    www.swissarbitration.ch
and Industry of          Berne
                         Geneva
                         Lausanne
                         Lugano
                         Zurich

**By fax and by mail**

Mrs. Teresa Giovannini
Lalive
Attorneys-at-Law
35 Rue de la Mairie
1207 Geneva

Zurich, 5 February 2008 / es

*Re:*      *1. Marco Stoffel, 2. Lauramca Holdings LLC versus 1. Maytown Universal SA, 2. Plympton Universal SA, 3. Vistra Trust Company (Jersey) Limited, as trustee for the Alsam, Colleen and Logany Settlements, 4. Alsam Holding AG, 5. Penny Asset AG, 6. Logany Equity AG, 7. Vierwaldstaetter Beteiligungen AG, 8. Clarick AG, 9. Colleen Investment AG, 10. Colleen Investment LLC, 11. Logany LLC, 12. Albeag Foundation, 13. Albe Associates Limited, 14. Bluecolt Securities, 15. Orconsult SA and 16. Orconsult Limited, as trustee for Aquarius and Capricorn trusts (CH)*

*Case No.:*    *600116-2008*

Dear Mrs. Giovannini,

The Chamber notes that under lit. C of the Notice of Arbitration Claimants present a list containing several agreements to arbitrate together with the parties to the different contracts.

According to Article 3, paragraph 3c) of the Swiss Rules, the Notice of Arbitration shall include a copy of the arbitration clause or the separate arbitration agreement that is invoked.

The Claimants are invited, **until 15 February 2008**, to make full particulars of the parties bound by the different agreements to arbitrate. We invite Claimants to specify which arbitration agreement they invoke between Claimant 1 and each one of the Respondents 1-16, as well as between Claimant 2 and each one of the Respondents 1-16.

Yours sincerely,

Dr. Lukas Briner
Member of the Arbitration Committee

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VISTRA TRUST COMPANY (JERSEY)
LIMITED AS TRUSTEE OF THE ALSAM;
COLLEEN AND LOGANY SETTLEMENTS;
COLLEEN INVESTMENT AG; ALSAM
HOLDING AG; PENNY ASSET AG;
LOGANY EQUITY AG;
VIERWALDSTATTER BETEILIGUNGEN
AG; CLARICK AG; COLLEEN
INVESTMENT, L.L.C.; LOGANY, L.L.C.;
AND WILLIAM TACON, RECEIVER AND
MANAGER OF THE ASSETS OF
MAYTOWN UNIVERSAL SA AND
PLYMPTON UNIVERSAL SA,

Index No.: 08 CV 02844

                                Plaintiffs,

              -against-

DR. MARCO STOFFEL; ALBE
ASSOCIATES LIMITED; BLUECOLT
SECURITIES CORPORATION;
LAURAMCA HOLDINGS, L.L.C.; AND
JOHN DOES 1-10,

                                Defendants.

---

# EXHIBIT C

## TO

**DECLARATION OF FRANÇOIS KNOEPFLER IN SUPPORT OF
DR. MARCO STOFFEL AND LAURAMCA HOLDINGS, L.L.C.S'
SUPPLEMENTAL MEMORANDUM OF LAW
IN FURTHER SUPPORT OF MOTION TO DISMISS**

Chambers of Commerce    Basel    www.swissarbitration.ch
and Industry of          Berne
                         Geneva
                         Lausanne
                         Lugano
                         Zurich

**By Courier Service**

Mrs. Teresa Giovannini
Lalive
Attorneys-at-Law
35 Rue de la Mairie
1207 Geneva

Dr. Philipp Kaenzig
Staiger Schwald & Partner
Attorneys-at-Law
Genferstrasse 24
P.O. Box 2012
8027 Zurich

Dr. Bernhard Lötscher and
Mrs. Aline Wey
CMS von Erlach Henrici
Attorneys-at-Law
Dreikönigstrasse 7
P.O. Box 2991
8022 Zurich

Mr. Peter Schatz
Kellerhals Hess
Attorneys-at-Law
Rämistrasse 5
8024 Zurich

Zurich, 10 March 2008 / es

*Re:*        *1. Marco Stoffel, 2. Lauramca Holdings LLC versus 1. Maytown Universal SA,*
*2. Plympton Universal SA, 3. Vistra Trust Company (Jersey) Limited, as trustee for the Alsam,*
*Colleen and Logany Settlements, 4. Alsam Holding AG, 5. Penny Asset AG, 6. Logany Equity*
*AG, 7. Vierwaldstaetter Beteiligungen AG, 8. Clarick AG, 9. Colleen Investment AG, 10. Col-*
*leen Investment LLC, 11. Logany LLC, 12. Albeag Foundation, 13. Albe Associates Limited, 14.*
*Bluecolt Securities, 15. Orconsult SA and 16. Orconsult Limited, as trustee for Aquarius and*
*Capricorn trusts (CH)*

*Case No.:   600116-2008*

Dear Madams,
Dear Sirs,

We thank Mrs. Teresa Giovannini for the payment of CHF 6'000.00, representing the Registration
Fee, received on 23 January 2008, as well as for the Notice of Arbitration filed against 1. Maytown
Universal SA, 2. Plympton Universal SA, 3. Vistra Trust Company (Jersey) Limited, 4. Alsam

Holding AG, 5. Penny Asset AG, 6. Logany Equity AG, 7. Vierwaldstaetter Beteiligungen AG, 8. Clarick AG, 9. Colleen Investment AG, 10. Colleen Investment LLC, 11. Logany LLC, 12. Albeag Foundation, 13. Albe Associates Limited, 14. Bluecolt Securities, 15. Orconsult SA and 16. Orconsult Limited on 21 January 2008 and received on 23 January 2008.

On 5 February 2008 the Chamber invited the Claimants to make full particulars of the parties bound by the different agreements to arbitrate and to specify which arbitration agreement Claimants invoke between Claimant 1 and each one of the Respondents 1-16, as well as between Claimant 2 and each one of the Respondents 1-16. The Chamber received Claimants' submission dated 20 February 2008 on 22 February 2008.

The Notice of Arbitration has been filed under the reference **"Case No 600116-2008"**, which the parties are kindly invited to mention in all future correspondence.

The Respondents will find herewith sixteen copies of the Notice of Arbitration, together with the pertaining Exhibits, as well as the Claimants' submission dated 20 February 2008 together with the pertaining Exhibits.

For your information, the Chamber of Commerce of Zurich as well as the Chambers of Commerce of Basel, Bern, Geneva, Ticino and Vaud have adopted the new Swiss Rules of International Arbitration ("Swiss Rules"), which entered into force on 1 January 2004. The Swiss Rules unify and harmonize the arbitration rules of the above-mentioned Chambers of Commerce and replace the Chambers' existing Rules in the field of international arbitration.

Pursuant to Article 1, paragraph 3 of the Swiss Rules, these Rules shall apply to all arbitral proceedings in which the Notice of Arbitration is submitted after 1 January 2004.

The Respondents are hereby invited to file their Answers **within thirty days from the receipt of this letter together with the Notice of Arbitration,** in accordance with Article 3, paragraphs 7-10 of the Swiss Rules.

Pursuant to Claimants' submission, it seems that the arbitration clauses provided in the "Donation Agreement" (Claimants' Exhibit C1), the "Escrow Confirmation" (Claimants' Exhibit C2) and the "Adoptation of Escrow Confirmation" (Claimants' Exhibit C3) are applicable to all the parties to this arbitration.

The "Donation Agreement" (Claimants' Exhibit C1) provides for Mini-Trial proceedings. On 23 May 2007 Claimant 1 filed a Notice of Mediation under the Swiss Rules of Commercial Mediation against Respondents 3 – 11 since the Mini-Trial proceedings have been replaced by the Swiss Rules of Commercial Mediation. The Mediation process failed.

The three agreements to arbitrate mentioned above do not provide for the number of arbitrators. The Claimants suggest that this case be referred to three arbitrators. The Claimants designated Professor Dr. Dominique Dreyer as arbitrator.

In multy-party proceedings, the arbitral tribunal is constituted in accordance with the parties' agreement (Article 8, paragraph 3 of the Swiss Rules).

In case the parties wish to refer this case to a sole arbitrator, they have the possibility to designate the sole arbitrator **within thirty days from the receipt of this letter**.

In case the parties wish to refer this case to a three-member arbitral tribunal, the Respondents are invited, pursuant to Article 8, paragraph 4 of the Swiss Rules, to designate their arbitrator **within thirty days from the receipt of this letter.**

The parties are advised that, pursuant to Article 8, paragraph 5 of the Swiss Rules, if a party or group of parties fail to designate an arbitrator, the Chamber may appoint all three arbitrators.

The Chamber reminds the parties that all designations of arbitrators are subject to confirmation in accordance with Article 5 of the Swiss Rules.

While maintaining strict neutrality between the parties, I am happy to answer any questions you may have in respect of the Swiss Rules.

Yours sincerely,

Dr. Lukas Briner
Member of the Arbitration Committee

**Enclosures:**
mentioned

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VISTRA TRUST COMPANY (JERSEY)
LIMITED AS TRUSTEE OF THE ALSAM;
COLLEEN AND LOGANY SETTLEMENTS;
COLLEEN INVESTMENT AG; ALSAM
HOLDING AG; PENNY ASSET AG;
LOGANY EQUITY AG;
VIERWALDSTATTER BETEILIGUNGEN
AG; CLARICK AG; COLLEEN
INVESTMENT, L.L.C.; LOGANY, L.L.C.;
AND WILLIAM TACON, RECEIVER AND
MANAGER OF THE ASSETS OF
MAYTOWN UNIVERSAL SA AND
PLYMPTON UNIVERSAL SA,

                                                    Plaintiffs,

                    -against-

DR. MARCO STOFFEL; ALBE
ASSOCIATES LIMITED; BLUECOLT
SECURITIES CORPORATION;
LAURAMCA HOLDINGS, L.L.C.; AND
JOHN DOES 1-10,

                                   Defendants.

---

Index No.: 08 CV 02844

# EXHIBIT D

## TO

**DECLARATION OF FRANÇOIS KNOEPFLER IN SUPPORT OF
DR. MARCO STOFFEL AND LAURAMCA HOLDINGS, L.L.C.S'
SUPPLEMENTAL MEMORANDUM OF LAW
IN FURTHER SUPPORT OF MOTION TO DISMISS**

# LALIVE
### Attorneys-at-Law

PIERRE LALIVE
MICHAEL E. SCHNEIDER
TERESA GIOVANNINI
XAVIER TROLLER
MARCUS C. BOSSHAN
CHRISTIANA de SANACLENS
DOMINIQUE BROWN-BERSET
GÉRALD PAGE
JEAN-PAUL VULLIÉTY
PATRICK LE HOUELLEUR
MATTHIAS SCHERER
ALEXANDER TROLLER
MARC BENNELLO
PIERRE-OLIVIER ALLAZ

CAROLINE OLSBURGH
BERNO REX
DOMITILLE BAIZEAU
FRANCESCA AZZI
DOMINIQUE RITTER
MAXIM TORETTI
DIRK LANNER
EVA NÖLI SR
ANTONIO ROMANETTI
JOACHIM KNOLL
MARA WARKAS

Trainees
LORENE MEY LAN
ANITA BOUVIER
CAROLINE MANCE

Counsel
JEAN-FLAVIEN LALIVE
PETER MALANCZUK
LÉON CAPUCCI
TROO BRUEKABER
ROBERT ROUD

By Registered Mail

Zurich Chamber of Commerce
Bleicherweg 5
P.O. Box 3058
8022 Zurich

Geneva, 21 January 2008

## NOTICE OF ARBITRATION

In the matter of

1.  **Marco Steffel**, Hochenstrasse 42, 8700 Kuesnacht, Switzerland

"Steffel" / Claimant 1

2.  **Lawrance Holdings LLC**, 340 West 12th Street, New York, New York, USA

"Lawrance" / Claimant 2

represented by **Teresa Giovannini**, Attorney at Law, Lalive , 35 Rue de la Mairie, 1207 Geneva, Switzerland, telephone: 0041 22 319 87 08; telefax: 0041 22 319 87 60; email: tgiovannini@lalive.ch

RUE DE LA MAIRIE 35   P.O. BOX 6569   CH-1211 GENEVA 6
TELEPHONE +41 22 319 87 00   FAX +41 22 319 87 60   E-MAIL info@lalive.ch   VAT 534 679
http://www.lalive.ch

# LALIVE
Attorneys-at-Law

2

versus

1.  Maytown Universal SA, c/o William Tacon, Receiver and Manager, P.O. Box 4571, Palm Grove House, 2nd Floor, Wickhams Cay, Road Town, British Virgin Islands

"Maytown" /    Respondent 1

2.  Plympton Universal SA, c/o William Tacon, Receiver and Manager, P.O. Box 4571, Palm Grove House, 2nd Floor, Wickhams Cay, Road Town, British Virgin Islands

"Plympton" / Respondent 2

Respondents 1 and 2 are represented by RA Dr.Philipp Kaenzig, Attorney at Law, Staiger Schwald & Partner, Genferstrasse 24, P.O. Box 2012, 8027 Zurich

3.  Vistra Trust Company (Jersey) Limited, as trustee of the Alsam, Colleen and Legasy Settlements, 38 Esplanade, St Helier, Jersey, Channel Islands

"Vistra" / Respondent 3

4.  Alsam Holding AG, c/o Christen und Zobrist Treuhand AG, Achereggstrasse 10, 6362 Stansstad, Switzerland

"Alsam AG" Respondent 4

5.  Pensy Asset AG, c/o Christen und Zobrist Treuhand AG, Achereggstrasse 10, 6362 Stansstad, Switzerland

"Pensy AG" / Respondent 5

6.  Legasy Equity AG, c/o Christen und Zobrist Treuhand AG, Achereggstrasse 10, 6362 Stansstad, Switzerland

„Legasy AG" / Respondent 6

7.  Vierwaldstaetter Beteiligungen AG, c/o Christen und Zobrist Treuhand AG, Achereggstrasse 10, 6362 Stansstad, Switzerland

"Vierwald AG" / Respondent 7

# LALIVE
#### Attorneys-at-Law

3

8.  Clarick AG, c/o Christen und Zobrist Treuhand AG, Achoreggstrasse 10, 6362 Stansad, Switzerland

"Clarick AG" / Respondent 8

9.  Colleen Investment AG, c/o Christen und Zobrist Treuhand AG, Achoreggstrasse 10, 6362 Stanstad, Switzerland

"Colleen AG" / Respondent 9

10. Colleen Investment LLC, c/o Corporation Service Company, 80 State Street, Albany, New York 12207-25423

"Colleen LLC" / Respondent 10

11. Logany LLC, c/o Corporation Service Company, 80 State Street, Albany, New York 12207-25423

"Logany LLC" / Respondent 11

Respondents 3 - 11 are represented by RA Dr. Bernhard Loetscher and RA Ailine Wey, CMS von Erlach Henrici, Dreikönigstrasse 7, P.O. Box 2991, 8022 Zürich

12. Albeag Foundation, c/o Trevisa- Treuhand-Anstalt & Trebona-Anstalt, Verwaltungs-und Treuhandbüro, Landstrasse 8, 9496 Balzers, Liechtenstein

"Albeag" / Respondent 12

13. Albe Associates Limited, c/o Orconsult SA, Wengistrasse 7, PO Box, 8026 Zürich

"Albe" / Respondent 13

14. Bluecolt Securities, c/o Orconsult SA, Wengistrasse 7, PO Box, 8026 Zürich

"Bluecolt / Respondent 14

15. Orconsult SA, Wengistrasse 7, PO Box, 8026 Zürich

"Orconsult SA" / Respondent 15

16. Orconsult Limited, as trustee for Aquarius and Capricorn trusts, c/o Orconsult SA, Wengistrasse 7, PO Box, 8026 Zürich

"Orconsult Ltd" / Respondent 16

Respondents 12 – 16 are represented by Directors Georges Philippe and Guido Banholzer, and Peter Schatz, Attorney at Law, Kellerhals Hess Rechtsanwaelte, Raemistrasse 5, 8024 Zurich

3

# LALIVE
### Attorneys-at-Law

**4**

---

## A. PRAYERS FOR RELIEF

### I. Preliminarily

1.  Order accounting by Orcorsult SA of payment of Protector Fee of € 1,800,000, of legal fees for Karlsruhe case and of loans paid to Stoffel, Sue Stoffel and Laurance;

2.  Order submission of corporate records, financial statements, bank statements and bank records by Orconsult SA of the Companies managed and controlled and used by them, in particular Maytown, Plympton, Ardeaol, Mirlo, Albe and Bluecolt as well as the "Scottish Partnerships" PB Partners, Deltam, ITC, Nevis, IPMG, ATC, Istalla and Interconsultants and all other entities that moneys have been channelled through either for the trusts and their entities, the Blickle Family, Stoffel/Laurance. The same is to be ordered regarding Orconsult SA/Ltd and all other Orconsult's entities as well as the bank accounts of Georges Philippe, insofar as they were used for money transfers and investments of the Blickle family/trusts including trust entities and Stoffel/Laurance.

3.  Order accounting of moneys and investments managed for Stoffel and Blickle Family as well as Alsom/Colleen/Logany trusts (Respondent 3) and Aquarius/Capricorn trusts and their entities by Orconsult SA and Orconsult Ltd (Respondent 16);

4.  Order documents regarding the relationship between Vistra and Orconsult Ltd;

5.  Order documents from Vistra regarding agreements between Vistra and Christen and Christen und Zobrist Treuhand AG.

### II. On the Merits

> **First Cause of Action: Order Payments**

6.  Order all Respondents to pay to Stoffel legal fees in the provisional amount of USD 3,017,771.- plus interest ;

7.  Order all Respondents to compensate Stoffel for all expenses and damages, the amount of which will be determined in the course of the proceedings, plus interest;

> **Second Cause of Action: Declaratory Judgements - Positive**

8.  Declare that the amount of USD 3,086,927 paid to Stoffel in Protector Fee and Legal Fees for the Karlsruhe case via loans has been repaid through the setting off of the Protector Fee owed to New Eagle Corp. and the legal fees owed to Stoffel;

9.  Declare that Stoffel has legally received USD 3,016,577 in salary and director fees from the Respondents;

**4**

# LALIVE
### Attorneys-at-Law

5

10.  Declare that Stoffel has legally received USD 782,614 as BPD research coordination fees;

11.  Declare that Stoffel has legally received USD 1.6 million as a loan that he is entitled to set off with the severance payment claims arising out of the mandate dated 1 November 1998;

12.  Declare that all other loans made to Stoffel and/or Lauranca and/or Mrs Sue Stoffel were properly made and have been totally and legally repaid and/or formally forgiven;

13.  Declare that Stoffel was authorized to release payments from the escrows and accounts held by the various Respondents;

14.  Declare that the funds presently held by Albe and Bluecolt in the amount of approximately USD 6 million belong to the Third Millennium Foundation (hereafter referred to as "TMF") and Borderline Personality Disorder Research Foundation (hereafter referred to as "BPDRF").

> **Third Cause of Action: Declaratory Judgements - Negative**

15.  Declare and assert that Stoffel did not make any material misstatements of fact to Vistra relating to the Jersey Trusts.

16.  Declare and assert that Stoffel did not breach his fiduciary duties in connection with 1) funds channelled by Orconsult SA to Albe/Bluecolt, 2) assets transferred from Alsam/Colleen/Logany trusts to Capricorn/Aquarius trusts and 3) payments received by Lauranca and himself, 4) loans received from Orconsult SA and/or TMF/BPDRF, 5) money transferred to TMF/BPDRF;

17.  Declare and assert that Stoffel did not breach his fiduciary duties to Vistra and/or Orconsult Ltd and or any other Respondents in connection with contributions to BPDRF and TMF or the transfer of the Jersey Trust assets;.

18.  Declare and assert that Lauranca did not aid and abet Stoffel in committing fraud as alleged in paragraph 2 above.

19.  Declare and assert that Stoffel did not breach his duties to Maytown and Plympton by not opposing Orconsult SA's using "false invoices" to order payments from Maytown and Plympton through "Scottish Partnerships" to Albe/Bluecolt, as all these entities were controlled by Orconsult SA and its officers;

20.  Declare and assert that Lauranca did not aid and abet Stoffel regarding the allegations in paragraph 19 above;

21.  Confirmation that Stoffel did not transfer funds of Vistra and/or Orconsult Limited and/or any trust entities without authority;

22.  Declare and assert that Stoffel did not make material misrepresentations to Maytown, Plympton, Vistra, and the Trust Beneficiaries.

6

# LALIVE
Attorneys-at-Law

6

23. Declare and assert that Stoffel did not make or permit unauthorized transfers to BPDRF, TMF, himself, Bluecolt, or Albe.

24. Declare and assert that Stoffel did not otherwise breach his fiduciary duties to Vistra and/or Orconsult Ltd and/or any of the Respondents and/or to New Eagle;

25. Declare and assert that Stoffel did not transfer funds without authority and that Stoffel did provide truthful and complete information regarding the Respondents' assets;

26. Declare and assert that Stoffel did not expend corporate resources for anything but business purposes and did not otherwise waste Respondents' corporate assets.

27. Declare and assert that Stoffel did not misrepresent to third parties that he was in a position of authority with regard to the Respondents Colleen LLC and Logany LLC;

28. Declare and assert that Stoffel's role as officer of Colleen LLC and Logany LLC did not result in any misappropriation of their assets;

29. Declare and assert that Stoffel did not otherwise breach his fiduciary duty to Colleen LLC and Logany LLC and/or Maytown and/or Plimpton;

30. Declare and assert that Stoffel did not mismanage the affairs of Colleen LLC and Logany LLC through self dealing, waste, misappropriation of assets or otherwise;

31. Declare and assert that Stoffel has not otherwise breached his fiduciary duties to Colleen LLC and Logany LLC and/or any of the other Respondents;

32. Declare and assert that neither Stoffel nor Lauranca have unjustly enriched themselves by wrongfully withdrawing the assets of the Respondents for personal use or by self dealing with the assets of the plaintiff companies;

33. Declare and assert that  both Stoffel and Lauranca did not breach their duties of loyalty by (i) causing payments to be made to BPDRF, TMF, Bluecolt or Albe,
(ii) causing payments to be made to themselves from assets of the LLC's and BVI companies
(iii) using LLC or BVI company funds for personal expenses,
(iv) providing free rental space at the LLCs' expense,
(v) executing agreements between the plaintiffs and companies on which Stoffel  and Lauranca exercised control, or
(vi) by any other means.

34. Declare and assert that neither Stoffel nor Lauranca did unlawfully transfer, receive, possess, retain, or convert funds belonging to the Respondents;

35. Declare and assert that neither Stoffel nor  Lauranca did have or receive funds from Respondents that were unlawfully distributed to them;

6

# LALIVE
Attorneys-at-Law

7

36. Declare and assert that Stoffel has not breached any of his fiduciary duties as officer of the Swiss entities, representative of the Protector, or in any other role;

37. Declare and assert that Stoffel did not control and/or manage Maytown/Plympton, Albe/Bluecolt, the "Scottish Partnerships", or any other of the Respondents.

## III. In any event

38. Claimants reserve the right to amend or amplify their claims in the course of the arbitration proceedings to the extent allowed under the Swiss Rules or to bring additional claims. Claimants specifically reserve the right to adjust the amount claimed.

39. Order the Respondents, jointly and severally, to the payment of all costs and fees of the arbitration proceedings, including the costs and fees incurred by the Claimants for their defense.

*****

# LALIVE
### Attorneys-at-Law

8

---

## B.    FACTS

## I.    Contractual Basis

1.    The Claims and the various Declaratory Reliefs sought by the Claimants in these arbitration proceedings are based primarily upon the following contractual documents:

1.1.    Donation to Borderline Foundation in Formation dated 16 December 1998 (Exhibit C.1.);

1.2.    Escrow Confirmation from Madison Corporate Developments Limited, Ireland (the Escrow Agent) and Personality Disorder Research Foundation in formation (the Principals) dated 15 January 1999 (Exhibit C.2.) and Taking over the rights of obligations of the Foundations and the Escrow Agent as follows: for the former, Principals, formerly: Personality Disorder Research Foundations in formation, now: Stiftung Persönlichkeitsstörungen, Basel, and Borderline Personality Disorder Research Foundation and Third Millenium Foundation, and for the Escrow Agent, formerly Madison Corporate Developments Limited, Ireland, Maytown Universal SA (Exhibit C.2.A);

1.3.    Adoptation of Escrow Confirmation of January 15, 1999 between Mayton Universal SA & Plumpton Universal SA, Colleen Investment AG and Colleen Investment LLC, through their parent company Alsam Holding AG, on the one hand, and Stoffel, Director of PDRF and TMF, on the other hand, dated 29 January 2001 (Exhibit C.3.);

1.4.    Consent of Treasurer Under the Escrow Confirmation of 15 January 1999 and 14 April 2002 dated 15 March 2002 (Exhibit C.4);

1.5.    Employment Agreement between Colleen Investment AG and its subsidiaries Colleen Investment LL and Logany LLC (the "Companies") on the one hand and Stoffel (the "Employee") on the other hand, dated 23 September 2004 (Exhibit C.5) together with Employment letter of 20 February 2006 (Exhibit C.5.A.), Aktennotiz from STM relating to Aquarius/Capricorn trusts concerning Stoffel's salary (Exhibit C.5.B) and Declaration by STM regarding Stoffel's salary 2006 and 2007 dated 2 February 2007 (Exhibit C.5.C.)

1.6.    Fiduciary Agreement between Chiltern Trust Company (Jersey) [the name was changed thereafter into Vistra] as Trustees of the Colleen Settlement (the "Principal") and Stoffel (the Trustee) concerning the Trustee's activity as Member of the Board of Directors of Colleen Investment AG and General Attorney of Madison Corporation Development Ltd dated 5 January 1999 (Exhibit C.6);

1.7.    Fiduciary Agreement between Chiltern Trust Company (Jersey) [the name was changed thereafter into Vistra] as Trustees of the Logany Settlement (the "Principal") and Stoffel (the Trustee) concerning the Trustee's activity as Member of the Board of Directors of Logany Equity AG and General Attorney of Millenium Import/Export Ltd (Exhibit C.7);

1.7.    Fiduciary Agreement between Chiltern Trust Company (Jersey) [the name was changed thereafter into Vistra] as Trustees of the Alsam Settlement (the

# LALIVE
### Attorneys-at-Law

9

---

"Principal") and M. Stoffel (the Trustee) concerning the Trustee's activity as
Member of the Board of Directors of Alsam Holding AG and Penny Asset AG and
General Attorney of First Asia Management Ltd (Exhibit C-8);

1.8.     Trust Agreement between Orconsult Ltd, Bermuda, as Trustee of Aquarius Trust
and Capricorn Trust (the Principal) and Stoffel, (the Trustee) concerning the
Trustee's activity as Fiduciary Shareholder and Member of the Board of Directors
of Alsam Holding AG and its subsidiaries Colleen Investment AG and Penny Asset
AG dated 20 January 2000 (Exhibit C-9);

1.9.     Trust Agreement between Orconsult Ltd, Bermuda, as Trustee of Aquarius Trust
and Capricorn Trust (the Principal) and Stoffel, (the Trustee) concerning the
Trustee's activity as Fiduciary Shareholder and Member of the Board of Directors
of Logany Equity AG and its subsidiaries Clarick AG and Vierwaldstätter
Beteiligungen AG dated 20 January 2000 (Exhibit C-10);

1.10.    Managing Director Agreement (Geschäftsführer Vertrag) between Angela Blicke
on the one hand, and Alsam Holding AG, on the other hand, dated 26 October 1998
(Exhibit C-11);

1.11.    Managing Director Agreement (Geschäftsführer Vertrag) between Clarissa Blicke
on the one hand, and Logany Equity AG, on the other hand, dated 26 October 1998
(Exhibit C-12);

1.12.    Managing Director Agreement (Geschäftsführer Vertrag) between Cedric Blicke on
the one hand, and Colleen Investment AG and Penny Asset AG on the other hand,
dated 26 October 1998 as amended on 21 January 2000 (Exhibit C-13);

1.13.    Loan Agreements between Stoffel, Sue Stoffel and Laurence, as Borrowers and
various entities of Orconsult (ATC, Orconsult SA), Colleen LLC and Colleen AG
as per enclosed list including three letters dated 28 January 2003 and 16 December
2005 (Exhibit C-14);

1.14.    Loan Agreements between TMF and BPDRF Foundations on the one hand, as
Lenders, and Stoffel, Sue Stoffel and Laurence, as Borrowers, dated 27 August
2002, 12 February 2004, 25 April 2005, 16 December 2005, respectively (Exhibit
C-15);

1.15.    Release for the period 1.1.1999 to 31 December 2003 from Clarissa and Cedric
Blickle in favour of the STPST, BPDRF and TMF's Foundations as well as their
Secretaries and Treasurers (Exhibit C-16);

1.16. ,  Release for the period 1.1.1999 to 31 December 2001 from Clarissa and Cedric
Blickle in favour of the Madison, Stoffel, Maytown and G. Bahnholzer (Exhibit C-
17);

1.17.    Releases for the period 1.08.1998 to 31 December 2004 from Clarissa and Cedric
Blickle in favour of the Stoffel for his roles in the Jersey (Alsam and Logany and
Colleen) and Bermuda (Aquarius and Capricorn) Trusts (Exhibit C-18);

1.18.    Trust Agreement between Holger, Clarissa and Cedric Blickle, on the one hand, and
M. Stoffel, on the other hand, concerning Karlsruhe litigation dated 26 June 2003
(Exhibit C-19);

1.19.    Partition Agreement for Heirs of Angela Blickle (Teilungsvertrag Nachlass Angela
Blickle-Lucke), namely Holger, Clarissa and Cedric Blickle dated 26 December
2002 (Exhibit C-20).

**LALIVE**
Attorneys-at-Law

10

## C.  JURISDICTION OF THE ARBITRAL TRIBUNAL and APPLICABLE LAW

2.  The contractual documents referred to above (# B) contain the same or similar arbitration clause providing for arbitration pursuant to the (now) Swiss Rules of International Arbitration in Zurich and for the Swiss substantive law as follows:

| | | | | |
|---|---|---|---|---|
| Donation to Borderline Foundation in Formation | Millenhuss, Fent, Alm, Madisos, M. Stoffel, Blickle, BPD | 16.12.1998 | C-1 | "All relationships of our family, the trusts (including trustees, protectors and beneficiaries) and its various entities with the officers and directors of the entities as well as with the foundation are subject to Swiss Law. All successors of these persons and entities are bound by this agreement. Exclusive Jurisdiction falls to arbitration in Zurich, according to the rules of the Zurich Chamber of Commerce including the mandatory submission to its Mini Trial. The parties expressly waive the right of appeal" |
| Escrow Confirmation | Madison Corporate Developments ltd. And Personality Disorder Research Foundations in formation | 15.01.1999 | C-2 | "Any successors to the Principal and/or the Escrow Agent are bound by the rights and duties stipulated in this agreement. In case of disputes an arbitration tribunal is to be set up according to the rules of Zurich Chamber of Commerce and the seat of the arbitration tribunal shall be Zurich/Switzerland.  The Parties expressly waive their right to appeal the arbitration award" |

# LALIVE
Attorneys-at-Law

11

| Agreement | Parties | Date | Document N° | Arbitration clause |
|---|---|---|---|---|
| Adoption of Escrow Confirmation | Maytown Universal SA and Plympton Universal SA, Colleen Investment AG and Colleen Investment LLC and PDRF and TRF | 29.01.2001 | C-3 | " The Escrow Confirmation of 1.15.1999 forms an integral part of this Agreement. "Any successors to the Principal and/or Escrow Agent are bound by the rights and duties stipulated herein; Disputes under this Agreement are subject to arbitration according to the rules of Zurich Chamber of Commerce, the seat of the arbitration tribunal being Zurich, Switzerland. The parties expressly waive their right to appeal the arbitration award" |
| Employment Agreement | Colleen Investment AG (and subsidiaries (Colleen Investment LLC and Logany LLC), for themselves and their related entities | 23.09.2004 | C-5 | " The Agreement is exclusively subject to Swiss law, the place of arbitration being Zurich. " Any claim of controversy that arises out of or relates to this agreement, or the breach of it, shall be settled exclusively by arbitration in accordance with the rules of the Zurich Chamber of Commerce. The parties submit to the Mini Trial mediation process as provided but the Chamber appointing the President of the Chamber or a person designated by him as the Mediator. Should the mediation fail, each side appoints one arbitrator and the arbitrators appoint the Chairman. The parties expressly waive their right to appeal and thus the award is final." |
| Fiduciary Agreements | Chiltern Trust Company Limited (principal) and Dr. Marco Stoffel (Trustee) etc. | 5.01.1999 | C-6 /C-7 and C-8 | "This Agreement is exclusively subject to SWISS LAW. In the event of a dispute between the parties in connection with this Agreement the parties will submit to the arbitration proceeding according to the rules of the Swiss Code on International Private Law, the place of arbitration being Zurich" |

**LALIVE**
Attorneys-at-Law

12

| Agreement | Parties | Date | Exhibits # | Arbitration Clause |
|---|---|---|---|---|
| Trust Agreements | Orconeut Limited, Bermuda (as Trustee of Aquarius and Capricorn Trust) and Dr. Marco Stoffel | 20.01.2000 | C-9 and C-10 | "This Agreement is exclusively subject to SWISS LAW, the place of arbitration being Zurich. * In the event of a dispute between the parties in connection with this Agreement the parties will submit to the arbitration proceeding according to the rules of the Zurich Chamber of Commerce, each party appointing one arbitrator and the two arbitrators appointing the Chairman. The parties expressly waive their right to appeal and thus the award is final" |
| Managing Director Agreements | Angela Bilckie, Absent; Clarissa Bilckie Logany AG; Cedrik Bilckie, Colleen AG and Penny AG | 26.10.1998 | C-11, C-12 and C-13 | (in free translation): This agreement is subject to Swiss law. In case of disputes, an arbitration proceeding according to the Rules of the Zurich Chamber of Commerce is to be held. The seat of the arbitral Tribunal is Zurich. A sole arbitrator is appointed; if the Parties do not agree on the person of this sole arbitrator, the President of the Zurich Chamber of Commerce appoints this sole arbitrator. The Parties expressly waive an appeal against the arbitral award" |
| Loans to M. and Sue Stoffel and/or Laurance | | 28.01.2003 | C-14 | "All disputes arising out and in connection with this agreement shall be finally settled according to the conciliation and arbitration rules of the Swiss Chamber of Commerce, Zurich" |
| Loans to M. and Sue Stoffel and/or Laurance | | 16.12.2005 | C-14 | "All disputes arising out and in connection with this agreement shall be finally settled according to the conciliation and arbitration rules of the Zurich Chamber of Commerce." |

## LALIVE
Attorneys-at-Law

13

| Agreement | Parties | Date | Document | Arbitration Clause |
|---|---|---|---|---|
| Declaration Regarding Recipients | Clariss and Cedrick Blickle (Depositors) and StPSL, BPORF, TMF, as well as their Secretaries and Treasurers (M.Hug, R. Merriil, and M. Stoffel) (collectively the Recipients) | 1/18/03 | C-18 | " This agreement shall be governed in all respects by SWISS LAW. In the event of a dispute between the parties in connection with this Agreement the parties will submit to the arbitration proceeding according to the rules of the Swiss Code on International Private Law, the place of arbitration being Zurich. An arbitration tribunal of three arbitrators is to be formed.  The rules of the Zurich Chamber of Commerce apply including Mini Trial.  The Depositors and the Escrow Agents each appoint one arbitrator.  In case one or both sides cannot agree on their on arbitrators, the Chambers President appoints him.  The two party arbitrators elect the Chairman of the arbitration tribunal.  The parties expressly waive their right to appeal against the arbitration award" |
| Declaration Regarding Escrow Agents | Clarisse and Cedrick Blickle (Depositors) Madison and M. Stoffel, and Maytown and G. Bahnholzer | 16.01.2003 | C-17 | " This agreement shall be governed in all respects by SWISS LAW.  In the event of a dispute between the parties in connection with this Agreement the parties will submit to the arbitration proceeding according to the rules of the Swiss Code on International Private Law, the place of arbitration being Zurich. An arbitration tribunal of three arbitrators is to be formed.  The rules of the Zurich Chamber of Commerce apply including Mini Trial.  The Depositors and the Escrow Agents each appoint one arbitrator.  In case one or both sides cannot agree on their on arbitrators, the Chambers President appoints him.  The two party arbitrators elect the Chairman of the arbitration tribunal.  The parties expressly waive their right to appeal against the arbitration award" |

LALIVE
Attorneys-at-Law

14

| Agreement | Parties | Date | Agreement | Arbitration Clause |
|---|---|---|---|---|
| Trust Agreement | Holger, Clarissa and Cedric Blickle, and M. Stoffel | 26.06.2003 | C-19 | " This Agreement is exclusively subject to SWISS LAW. In the event of a dispute between the Parties in connection with this Agreement, the Parties will submit to the arbitration proceeding according to the rules of the Swiss Code on International Private Law, the place of arbitration being Zurich. An arbitration tribunal of three arbitrators is to be formed. The Rules of the Zurich Chamber of Commerce apply, including minitrial. The Principal and the Trustee each appoint one arbitrator. In case that the three individuals forming that Principal cannot agree on their one arbitrator, the Chamber's President appoints him. The two party arbitrators elect the Chairman of the arbitration tribunal. The parties expressly waive their right to appeal against the arbitration award" |
| Sharing Agreement for Heirs of Angela Blickle-Lucke | Holger, Clarissa and Cedric Blickle | 26.12.2002 | C-20 | " The law of the place of conclusion of the contract shall govern for the purposes of the form of this contract. Swiss law shall govern the content of the contract. In the event of disputes arising from this contract, an arbitration court seated in Zurich shall have exclusive jurisdiction; in this regard, an individual arbitration judge appointed by the Chamber shall render a decision. The Rules of the Zurich Chamber of Commerce, including minitrial, shall be applicable. The parties expressly waive contestation of the arbitration judgment" |

## D.    DESCRIPTION OF THE DISPUTE (SUMMARY)

3.       This litigation is part of a broader series of legal actions brought by some of the Respondents in five different countries.  Cast as an action to recover assets purportedly misappropriated by defendant Dr. Stoffel, this action really is about two heirs seeking with the help of Vistra to circumvent the trust structure established by their mother to protect assets and save taxes.  The heirs, Clarissa and Cedrick Blickle are two young adults attempting to assert control over the trusts in violation of the intent of the settlor of the trusts (their deceased mother) and in contravention of the trust instruments.  Not only do these siblings with the help Vistra seek control for their own selfish ends, but they also want to deny and reverse certain charitable contributions that their mother made shortly before her sudden and untimely death.

# LALIVE
### Attorneys-at-Law

15

**I.    Creation of the Trust Structure**

4.    In late 1998, Mrs. Angela Blickle, made two charitable donations of $ 24 Mio and $ 12 Mio out of the family's fortune of approximately $80 Mio (DM 150 Mio) and then on behalf of herself and her husband Holger Blickle, created an intricate trust structure, into which the donations were put in escrow with the same trust entities as the rest of the entrusted assets of $ 44 Mio. The purpose of the trust structure was to save the family approximately $40 million in tax liabilities. Accordingly, the trusts were deliberately structured as discretionary and irrevocable as German tax law at that time exempted from gift and estate tax only transfers to such trusts as . *In a non-binding Letter of Wishes* Mrs. Blickle also stipulated that the funds be invested in real estate for the long-term in accordance with the family's traditional buy and hold philosophy.

5.    The trust structure was to serve two basic purposes. On the one hand it was to preserve the approximately $44 Mio assets for herself and her two adult children Clarissa and Cedrick Blickle, particularly from her estranged husband and his two brothers who were engaged in heated litigation with one another about their family fortune. On the other hand, the trusts were to serve as escrow agents for the two charitable donations she made before the trusts were established.   For these assets she set up a concept that she called "Doctors with Borders", whereby the trusts could invest these donated funds of approximately $ 36 Mio for their own benefit until the donations were actually needed. Mrs. Blickle's donation of $24 million on December 16, 1998, and her donation of $12 million on December 18, 1998, were specifically designated to fund research into so-called Borderline Personality Disorder, a condition that afflicted Mrs. Blickle's husband and his family and had brought a lot of misery into her marriage. This charitable purpose as later extended to also further tolerance education. Three Trusts, the Alsam, Logany and Colleen Settlements named as plaintiffs herein, were created under the laws of the island of Jersey. The $80 million in assets, consisting of both real estate investments and liquid assets, were held by four Swiss companies, Colleen Investment AG, Logany Equity AG, Alsam Holding AG and Peony Asset AG, which are also named as Respondents herein, and three Irish non-resident companies Millennium, First Asia and Madison, which were all owned by Angela Blickle and her two children.

6.    On December 18, 1998 the shares of the four Swiss companies mentioned above were brought into the three Jersey Trusts Alsam, Logany and Colleen Settlements (above, # 5). Vistra Trust Company Jersey Ltd. was named as Trustee of the three Settlements and Dr. Stoffel was designated as the person in charge of New Eagle Corporation Ltd. ("New Eagle"), the corporate entity serving as Protector of the trust structure.

7.    Between the death of their mother in February 1999 and the summer of 2006, both Clarissa and Cedrick worked closely with Dr. Stoffel, who acted as the liaison between the trusts and them. They had executed declarations that they were representing the trusts and thus were entitled to give instructions on behalf of the trusts (Declarations re Jersey Trust and Bermuda trusts). Thus, every year Dr. Stoffel sent them the detailed un-audited financial statements listing all entities of the trusts and their assets.  Dr. Stoffel explained to both Clarissa and Cedrick the details underlying the un-audited financial statements and, at the end of that

15

## LALIVE
Attorneys-at-Law

process, both Clarissa and Cedrick issued releases to the trustees, the trust managers and Dr. Stoffel to demonstrate their understanding and approval of the actions taken on their behalf.

8.  In particular Clarissa and Cedrick were informed about the status of the trusts and the tremendous increase in the value of the trusts' assets, including millions of dollars in annual distributions to Respondents Maytown and Plympton . Of particular interest to them were the expenses, which were listed in these statements as "operational expenses." These expenses were divided into two categories: "administrative expense" and "other operational expense." The first category contained mainly transfers made and fees paid to various Orconsult entities; the second category contained all the distributions to charities and family members.

9.  Clarissa and Cedrick Blickle signed the escrow agreements in 1999 in their own names and on behalf of the trust entities, which held the two donations that their mother had made prior to the establishment of the Trusts. They also were told in detail how the donations were spent in grants contributed to Borderline Personality Disorder research and tolerance education through two charitable foundations -- the Borderline Personality Disorder Research Foundation ("BPDRF") and the Third Millenium Foundation ("TMF") (collectively, the "Foundations"). Both Clarissa and Cedrick also issued releases approving those activities.

10.  Moreover, in 1999 both Clarissa and Cedrick participated in and approved of a change in the trust structure proposed by Vistra that transferred the trust assets from certain trusts established in the Jersey Islands to two trusts created under the laws of Bermuda, the Capricorn and Aquarius Trusts. Indeed, that structural change was brought about by a challenge to the structure from their father Holger Blickle, who threatened to sue his own children in order to obtain greater personal access to the assets of the trusts. In a meeting on August 13, 1999, attended by representatives of Vistra, the decision was taken to establish three Bermuda Trusts, one each for the children and the father. The Capricorn and Aquarius trusts had as their sole beneficiaries Clarissa and Cedric Blickle, respectively; and the later established Francis Trust had as sole beneficiary Holger Blickle. Thus, far from eliminating Clarissa and Cedrick as beneficiaries of the trusts, the designation of Aquarius and Capricorn Trusts as beneficiaries was done with the approval and for the protection of Clarissa and Cedrick. At that time Clarissa had finished law school and Cedrick had started grad school of economics; thus they knew very well what they were doing and instructing. In connection with the new trust structure the three Irish companies were replaced with the two BVI companies Maytown and Plympton, two more Swiss companies, Clarick AG and Vierwaldstaetter Beteiligungen AG, and the two US entities Colleen Investment LLC and Logany LLC were added. All six of these companies are also Respondents in this proceeding.

## II    The Blickles'Efforts to Gain Control of the Trust Assets

11.  Respondents 1 to 11 in their various proceedings stated that this dispute is about greed and malfeasance, but they clearly point the finger at the wrong party. These proceedings are not about the purported theft of funds by Claimant Dr. Marco Stoffel. Although Dr. Stoffel has been well compensated over the past ten years, his level of compensation had been fixed by Angela Blickle at what he would have earned in continuing his legal practice that he abandoned for this purpose (Exhibit C-1, # 3). As a matter of fact (and for the purpose of giving an example), his coordination of the research effort led to BPD being a recognized

## LALIVE
Attorneys-at-Law                                                    17

mental illness disorder, which is now listed in the U.S. Government's Directory of Mental Illness IV ("DSM IV"). Due to Dr. Stoffel's efforts, three Nobel Laureates joined the board of BPDRF (at no compensation !). This, in turn, led to young investigators looking into the disorder and to the National Institute of Mental Health ("NIMH") increasing funding into this research from relatively minimal amounts in 1999 to millions of dollars by 2006. Similarly, Dr. Stoffel's efforts in tolerance education led to successes at TMF, which is now the leading field builder of tolerance education.   Last, but not least, his connections in the United States and New York in particular helped the trust to invest in funds that generated huge profits and increase the value of the trust assets from $80 million to at least $150 million. Thus, the unaudited financial compilations as of December 31, 2006 for Maytown/Plympton include the assets held by each of the six Swiss companies, the two U.S. based LLC's, as well as Maytown and Plympton. Those financial statements list $115 million in assets.  That $115 million figure does not, however, include approximately $6 million distributed to Clarissa and Cedrick between 1999 and 2006, donations of $10.6 million to BPDRF and TMF between 1999 and 2006, $6.9 million in fees paid to Dr. Stoffel and the $12 million (historical exchange rate applied to USD, Euro and CHF) paid by Maytown and Plympton to various Orconsult entities (depending on the applied exchange rate this amount could be as high as $13,8 Mio). Accordingly, the value of the trust assets at least doubled between 1999 and 2006. In fact, the increase in value was substantially greater still, because Logany LLC's investment in the office building at 1 Broadway is valued on the financial statement at only $45 million. Its real market value is actually closer to $104 million.  Thus, the value of the trust assets almost tripled as it increased from approximately $80 million in 1999 to approximately $210 million by the end of 2006.

12. The true measure of greed and malfeasance is to be found with Clarissa and Cedrick Blickle and their recent efforts to destroy the trust structure for their own personal gain.  Unwilling to live within the structure designated by their deceased mother, both Clarissa and Cedrick now wish to disavow that structure, including it charitable purposes, in order so get full and complete control over the trust assets.  To accomplish this goal, the Blickle children have had to wrest control of the trust structure from Orconsult Ltd. – the duly appointed Trustee – and from New Eagle Corp (represented by Dr. Stoffel) the entity designated by Angela Blickle as the Protector of the trust structure.  Their methods have been nothing short of astonishing.

13. Indeed, in July 2006, Clarissa for the first time stated her view that the trust structure created by her mother in 1998 was never supposed to be permanent and with discretionary distribution powers in the hands of the trustees, but rather was intended by the family to exist for only a limited duration of five years to then be distributed in its entirety to them. That position is, of course, diametrically opposed to the Deeds of Trust that create discretionary (not only for them) and *irrevocable (not just for 5 years)* trusts.  Especially the alleged limited duration would nullify the irrevocability of the trusts and would require substantially different tax treatment under applicable Swiss and German tax laws. Indeed, Clarissa's statement, if true, would be tantamount to tax fraud on the part of the Blickle family and Vistra. The Trustee of the Bermuda Trusts, Orconsult Limited, the trust manager Orconsult SA, and the Trust Protector, New Eagle (through Dr. Marco Stoffel), refused the Blickle children's 2006 request to distribute all trust assets to them. In order to circumvent this refusal, the Blickles engaged the former trustee of the Jersey Trusts to challenge the change of 1999 and claim all trusts assets to still belong to the Jersey trusts.

## LALIVE
#### Attorneys-at-Law

13. This refusal started the efforts by Blickles and Vistra to regain control of the trust assets. Clarissa and Cedrick, along with Vistra began to allege for the first time that the August 13, 1999 decision to transfer of all trust assets to the two Bermuda trusts was never implemented and thus null and void. For the previous seven years Vistra and the Blickles had never challenged this transfer. Yet now, in an effort to bust the trust structure, they focus on Vistra's own failure to execute certain documentation evidencing the decision to transfer the assets from one set of trusts to another and assert that Dr. Stoffel somehow acted fraudulently in accomplishing this transfer. Yet, it is Vistra and the Blickles who are engaged in misrepresentations to press their claims before courts in jurisdictions such as the Jersey Islands, Bermuda, the British Virgin Islands, the United Kingdom, the United States and Switzerland.

### III.    Sham Shareholder Meetings of the Swiss Companies

15. In December of 2006, Clarissa and Cedrick escalated the dispute to gain control of the Trust assets. Placing pressure on Vistra, the Trustee of the Jersey Trusts that had been functionally inoperative since 1999, Vistra staged a series of sham shareholder meetings on December 6, 2006 for each of the six Swiss companies without having the bearer shares. All the shares were with Dr. Stoffel based on his fiduciary agreement with Orconsult Limited. Accordingly, the purported shareholders' meetings of the six Swiss Companies, as well as the actions taken therein and pursuant thereto, were without proper authorization and, under applicable Swiss law are null and void. Nullity claims against these shareholders meetings and interpleader claims for assessing the rightful share ownership were thereafter made pendent in the competent Swiss court. The fact that the directors elected in those shareholders meetings were then registered by the Swiss authorities as the companies' officers does not make them valid representatives for those who know about the illegal elections. Vistra and these officers never told third parties about this nullity litigation and asserted control of the trust assets through the illegally appointed officers. Only in two instances did banks not go along with this "hijacking" of assets: Deutsche Bank New York (DB) and HVB Freiburg/Germany ("HVB") did not free the liquid assets in the accounts of the trust entities as requested by these officers. Other banks like Wachovia, Fortis and Lloyds however did follow their instructions to empty the accounts. Respondents want to cast Dr. Stoffel as a criminal in order to convince DB and HVB that they are the rightful owners, without having the Swiss courts decide on the nullity claims and the interpleaders.

### IV.    Vistra's Use of *Ex Parte* Proceedings

16. Based on these fraudulently conducted shareholders' meetings, Respondent Vistra purported to replace the directors of each of the six Swiss companies. Thus, Mr. Georges Philippe and Mr. Guido Bassholzer, as representatives on the boards of the six Swiss companies for the Bermuda trustee Orconsult Limited and the trust manager Orconsult SA, and Dr. Stoffel as board representative for the Protector New Eagle were replaced by a slate of Vistra designated directors. Vistra then continued on its campaign of instituting legal proceedings in various jurisdictions.

# LALIVE
Attorneys-at-Law

19

17.  Vistra had already initiated an *ex parte* judicial proceeding in the Island of Jersey several weeks earlier seeking, *inter alia*, to remove New Eagle as Protector of the trusts and Dr. Stoffel as the authorized representative of New Eagle. On December 11, 2006, plaintiffs also initiated an *ex parte* proceeding in Bermuda to block Orconsult Limited (the Trustee), New Eagle, (the Protector) and Dr. Stoffel from acting for the Bermuda trusts and the trust related entities.

18.  Shortly after conducting the sham board meetings, Vistra initiated another *ex parte* proceeding in the British Virgin Islands (BVI) to remove Messrs. Banholzer and Philippe as Directors of plaintiffs Maytown and Plympton and to obtain the appointment of plaintiff Williams Tacon as receiver and manager of the assets of those two entities.

19.  Based upon the order of the BVI court, Vistra initiated an application in Delaware Chancery Court for the books and records of two U.S. Limited Liability Companies that hold certain real estate investments in the United States.  Not content with that, Vistra next commenced an *ex parte* proceeding in the United States District Court for the Southern District of New York seeking discovery, pursuant to 28 U.S.C. Section 1782, in support of a foreign judicial proceeding – namely the afore mentioned BVI proceeding.

20.  Finally, on the Friday before Christmas Eve, Vistra brought another *ex parte* proceeding in the Supreme Court of the State of New York, County of New York, seeking a Temporary Restraining Order and injunctive relief to freeze Dr. Stoffel's personal assets, including his private bank accounts.  As with the other *ex parte* proceedings brought by Vistra, the grounds here are flimsy at best.

21.  To sum it up:

   ➢  if Vistra is the trustee of all Respondents 1 -11, these trusts would be sham trusts, as Vistra did nothing from December 1998 through December 2006;
   ➢  if Alsam/Colleen/Logeny Trusts and/or Aquarius/Capricorn Trusts were only established for a limited time and/or have the Blickle Family as sole beneficiaries, Vistra and Orconsult Limited/SA and all their entities would have committed tax fraud;
   ➢  If Orconsult SA paid personal bills of Stoffel and/or Lamranca from trust funds, that were not loans granted or fees earned, they would have violated the Swiss law on money laundering.

## E. PRELIMINARY REQUEST FOR PRODUCTION OF DOCUMENTS

22.  In order to properly ascertain their claims, the Claimants have required from the Tribunal to preliminarily order Respondents to produce documents. These requests (see Prayers for Relief N°...) are briefly motivated herebelow:

19

# LALIVE
Attorneys-at-Law

20

23. Allegedly, the annual Protector fee of € 200'000.- owed to New Eagle was advanced through loans to M. and S. Stoffel amounting to € 1'800'000.- over the nine years passed since inception of the trusts. Orconsult SA managed this amount and paid personal bills of M. and S. Stoffel in calling that credit line. Also, the legal fees to M. Stoffel for his work on the Karlsruhe litigation were put into the same funds managed by Orconsult SA and used to pay M. Stoffel's personal bills as well. Claimants, and probably Respondents 1 to 11, cannot assess how these funds and how much of these funds were used. It is very possible that Orconsult SA commingled these funds with funds of the Blickles' and or the trusts, which would give the appearance that personal bills of M. Stoffel were paid by these third parties.

24. With respect to the loans, Orconsult SA, directly or indirectly through its entities, granted loans to Stoffel and Mrs Sue Stoffel and Lauranca (Exhibit C-14 and C-15) and it is unclear what the sources of these funds were. The production required will allow the Claimants to fully support their case that these loans were taken from the proper funds.

25. Besides, Claimants have only documents showing the authority of Orconsult Ltd (as trustee for Aquarius/Capricorn Trusts, the " Bermuda Trusts") to act as owners of the various trust entities (namely the six Swiss companies, the two BVI companies and the two US entities) since December 1999. However, the Claimants do not have the documents that evidence the underlying arrangements for the ownership transfers from Vistra (as trustee of Aksum/Colbeca/Logany Trusts, the "Jersey Trusts")) to Orconsult ltd. These documents are essential since Vistra alleges in various fora that the assets of the Jersey trusts were not validly transferred to the Bermuda trusts and that M. Stoffel is responsible for that.

26. Moreover and in addition, Respondents 1 to 11 have to produce the documents evidencing their arrangements with Mr. Christen and/or Christen & Zobrist Treuhand AG. Christen and his company are the domicile holders for all the six Swiss Companies. Respondents 1 to 11 have filed a summons against Mr Christen with the New York Supreme Court, County of New York in December 2007, ordering him to hand over all the files of these six companies. Mr. Christen has complied with this Order. On the other hand, Mr Christen has also filed with the Swiss Courts a motion to withdraw the claims he had previously made against Respondents 1 to 11 for the nullity of the shareholders meeting of December 2006 of all the six Swiss Companies. In addition, Respondents 1 to 11 together with Mr Christen filed with the Swiss Courts to discontinue the litigation about Mr Christen's one percent shareholding in all the six Swiss Companies. It is obvious that these three steps must have all been agreed upon between Vistra and Mr Christen in order to allow Vistra to take total and unlimited control of the Trust entities, namely the six Swiss Companies, the two BVI and the two US companies and thus prevent a court decision on the ownership issues.

27. Besides, Orconsult SA was the manager of all trust assets. G.Benholzer and G.Philippe had signature power on all accounts of the trust entities and the various onshore and offshore Orconsult entities. Stoffel only used his signature power on the escrow accounts

# LALIVE
Attorneys-at-Law

of Colleen LLC and Colleen AG as per the authority granted to him by the various escrow agreements.

28.  The crux of the case is, that the Claimants and probably Respondents 1-11 as well, cannot assess for whom Orconsult SA held funds in which of their entities and what the reasons for the payments from these funds were. Orconsult used dozens of offshore companies and their bank accounts as per the enclosed list (Exhibit C- 22). For example, in another proceeding Respondents 1 and 2 submitted a report of accounts that Orconsult had managed at Lloyds in London, where one can see that transfers were made to their offshore companies (labeled "Scottish Partnerships"), TMF, Colleen LLC, Penny AG, Orconsult Limited and Orconsult SA (Exhibit C - 23). The same Scottish Partnerships (PB Partners, Deltass, ITC, Mirlo, Nevis, IPMG, ATC, Istalla, Interconsultants) held also moneys of Stoffel from legal bills his firm had charged in 1999 (Exhibit C - 24). Claimants therefore require complete bank records and/or accounting statements for a complete tracing of these transfers.

29.  The BVI company Albe was established for the Blickle Family and held assets for them (London apartment) and for the foundations (see Exhibit C No.15). In 2005 an additional Panamenian company, Bluecolt, was also established by Orconsult SA for the same purpose. As only found out in 2007, Orconsult had wrongly indicated Stoffel as the beneficial owner of these two entities. Allegedly personal bills of Stoffel were paid from Albe and Bluecolt accounts. Stoffel indeed had personal moneys managed by Orconsult SA, which started long before Orconsult managed moneys for the trusts and the Blickle Family (an example a few transfers of Stoffel's private moneys is listed in Exhibit C N.24). If indeed private bills of Stoffel were paid from Albe/Bluecolt, then their financial statements would have to show, that either these two entities were reimbursed from Stoffel funds or a claim was entered in their books against an entity that held Stoffel funds or an offset was booked with fees and loans owed to Stoffel.

30.  These facts show how important it is for resolving this case to have the requested documents, accounting and financial statements submitted in order for the Claims to be properly and adequately addressed.

## F. PROCEDURAL ISSUES

### I.    Mediation

31.  As required by the arbitration clause contained in the Donation Agreement (Exhibit C-1) as well as in the Employment Agreement (Exhibit C-5) Claimants filed a Request for Mediation with the Zurich Chamber of Commerce on 23 May 2007 (Exhibit C-21). The mediation process failed.

# LALIVE
Attorneys-at-Law

## II.    Other Procedural Issues

32.    Be it under an express arbitration clause or through the fact that, pursuant to the Donation Agreement of 16 December 1998, " ... *all the trusts (including trustees, protectors and beneficiaries) and its various entities with the officers and directors of the entities as well as with the foundation are subject to Swiss law*" and "*All successors of these persons and entities are bound by this agreement*", it appears that the entirety of the contractual or release documents mentioned above (# B) are subject to arbitration in Zurich under the Swiss Rules, the Swiss substantive law being applicable to the merits of the dispute at hand.

33.    As to the number of the arbitrators, the Claimants hold that the complexity of the contractual and financial relationships makes that a three member tribunal should be appointed. The Claimants designate on their side as their party appointed arbitrator:

Professeur Dr Dominique Dreyer
Attorney at Law
Hartmann & Dreyer
Bd de Pérolles 7
P.O. Box 736
Telephone    0041 26 309 20 70
Telefax      0041 26 323 23 66
Email        dominique.dreyer@hdlaw.ch

34.    Claimants paid the Registration Fee of CHF 6'000.- by transfer to the account of the Zurich Chamber of Commerce on 21 January 2008 (Exhibit C-26)

*****

For the Claimants

Teresa Giovannini, Attorney at Law

Geneva, 21 January 2008

Annex: Power of Attorney and List of Exhibits N° 1 to 26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VISTRA TRUST COMPANY (JERSEY) LIMITED AS TRUSTEE OF THE ALSAM; COLLEEN AND LOGANY SETTLEMENTS; COLLEEN INVESTMENT AG; ALSAM HOLDING AG; PENNY ASSET AG; LOGANY EQUITY AG; VIERWALDSTATTER BETEILIGUNGEN AG; CLARICK AG; COLLEEN INVESTMENT, L.L.C.; LOGANY, L.L.C.; AND WILLIAM TACON, RECEIVER AND MANAGER OF THE ASSETS OF MAYTOWN UNIVERSAL SA AND PLYMPTON UNIVERSAL SA,<br><br>                                  Plaintiffs,<br><br>              -against-<br><br>DR. MARCO STOFFEL; ALBE ASSOCIATES LIMITED; BLUECOLT SECURITIES CORPORATION; LAURAMCA HOLDINGS, L.L.C.; AND JOHN DOES 1-10,<br><br>                                  Defendants. | Index No.: 08 CV 02844 |

# EXHIBIT E

## TO

**DECLARATION OF FRANÇOIS KNOEPFLER IN SUPPORT OF
DR. MARCO STOFFEL AND LAURAMCA HOLDINGS, L.L.C.S'
SUPPLEMENTAL MEMORANDUM OF LAW
IN FURTHER SUPPORT OF MOTION TO DISMISS**

# LALIVE

### Attorneys-at-Law

PIERRE LALIVE
MICHAEL E. SCHNEIDER
TERESA GIOVANNINI
MARCUS C. BOEGLIN
CHRISTIANE de SENARCLENS
DOMINIQUE BROWN-BERSET
GÉRALD PAGE
JEAN-PAUL VULLIETY
PATRICE LE HOUELLEUR
MATTHIAS SCHERER
ALEXANDER TROLLER
MARC HENZELIN
VEIJO HEISKANEN
GEORGES RACINE
DOMITILLE BAIZEAU
ROBERT PIETROWSKI
PIERRE-OLIVIER ALLAZ

BERND EHLE
FRANCESCA AZZI PRICE
DOMINIQUE RITTER
DIRK LANGER
ANTOINE ROMANETTI
JOACHIM KNOLL
NICOLAS LEROUX
NORADELE RADJAI
VINCENT TATTINI
LAETITIA FEUGLET
NATHALIE BIGLER
THOMAS WIDMER
SONJA MAEDER
GUILLAUME TATTEVIN

Counsel
JEAN-FLAVIEN LALIVE
KAMEN TROLLER
PETER MALANCZUK
LUIGI CAPUCCI
ROBERT KOLB

**By Registered Mail**

Zurich Chamber of Commerce
Bleicherweg 5
P.O. Box 3058
<u>8022 Zurich</u>

Geneva, 20 February 2008

\\lsrv-laliwe001\lsmartie.docs3\06092\TF00816682.DOC/

## COMPLEMENT TO

## THE

## NOTICE OF ARBITRATION

In the matter of

1.  **Marco Stoffel,**  Hoehenstrasse 42, 8700 Kuesnacht, Switzerland

**"Stoffel" / Claimant 1**

2.  **Lauramca Holdings LLC,** 340 West 12th Street,  New York, New York, USA

**"Lauramca" / Claimant 2**

RUE DE LA MAIRIE 35   P.O. BOX 6569   CH-1211 GENEVA 6
TELEPHONE +41 22 319 87 00   FAX +41 22 319 87 60   E-MAIL info@lalive.ch   VAT 324 679
http://www.lalive.ch

# LALIVE
### Attorneys-at-Law

2

represented by **Teresa Giovannini and Christiane de Senarclens**, Attorneys at Law, Lalive , 35 Rue de la Mairie, 1207 Geneva, Switzerland, telephone: 0041 22 319 87 08; telefax: 0041 22 319 87 60; email: tgiovannini@lalive.ch; cdesenarclens@lalive.ch

LALIVE
Attorneys-at-Law

3

---

versus

1. **Maytown Universal SA,** c/o William Tacon, Receiver and Manager, P.O. Box 4571, Palm Grove House, 2nd Floor, Wickhams Cay, Road Town, British Virgin Islands

**"Maytown" /     Respondent 1**

2. **Plympton Universal SA,** c/o William Tacon, Receiver and Manager, P.O. Box 4571, Palm Grove House, 2nd Floor, Wickhams Cay, Road Town, British Virgin Islands

**"Plympton" / Respondent 2**

**Respondents 1 and 2 are represented by RA Dr.Philipp Kaenzig,** Attorney at Law, Staiger Schwald & Partner, Genferstrasse 24, P.O. Bpx 2012, 8027 Zurich

3. **Vistra Trust Company (Jersey) Limited, as trustee of the Alsam, Colleen and Logany Settlements,** 38 Esplanade, St Helier, Jersey, Channel Islands

**"Vistra" / Respondent 3**

4. **Alsam Holding AG,** c/o Christen und Zobrist Treuhand AG, Achereggstrasse 10, 6362 Stanstad, Switzerland

**"Alsam AG" Respondent 4**

5. **Penny Asset AG,** c/o Christen und Zobrist Treuhand AG, Achereggstrasse 10, 6362 Stanstad, Switzerland

**"Penny AG" / Respondent 5**

6. **Logany Equity AG,** c/o Christen und Zobrist Treuhand AG, Achereggstrasse 10, 6362 Stanstad, Switzerland

**„Logany AG" / Respondent 6**

7. **Vierwaldstaetter Beteiligungen AG,** c/o Christen und Zobrist Treuhand AG, Achereggstrasse 10, 6362 Stanstad, Switzerland

**"Vierwald AG" / Respondent 7**

# LALIVE
Attorneys-at-Law

4

8.    **Clarick AG,** c/o Christen und Zobrist Treuhand AG, Achereggstrasse 10, 6362 Stanstad, Switzerland

"Clarick AG" / Respondent 8

9.    **Colleen Investment AG,** c/o Christen und Zobrist Treuhand AG, Achereggstrasse 10, 6362 Stanstad, Switzerland    .

"Colleen AG" / Respondent 9

10.    **Colleen Investment LLC,** c/o Corporation Service Company, 80 State Street, Albany, New York 12207-25423

"Colleen LLC" / Respondent 10

11.    **Logany LLC,** c/o Corporation Service Company, 80 State Street, Albany, New York 12207-25423

"Logany LLC" / Respondent 11

**Respondents 3 - 11 are represented by RA Dr.Bernhard Loetscher and RA Ailine Wey, CMS von Erlach Henrici, Dreikönigstrasse 7, P.O. Box 2991, 8022 Zürich**

12.    **Albeag Foundation,** c/o Trevisa- Treuhand-Anstalt & Trebona-Anstalt, Verwaltungs-und Treuhandbüro, Landstrasse 8, 9496 Balzers, Liechtenstein

"Albeag" / Respondent 12

13.    **Albe Associates Limited,** c/o Orconsult SA, Wengistrasse 7, PO Box, 8026 Zürich

"Albe" / Respondent 13

14.    **Bluecolt Securities,**c/o Orconsult SA, Wengistrasse 7, PO Box, 8026 Zürich

"Bluecolt / Respondent 14

15.    **Orconsult SA,** Wengistrasse 7, PO Box, 8026 Zürich

"Orconsult SA" / Respondent 15

16.    **Orconsult Limited, as trustee for Aquarius and Capricorn trusts,** c/o Orconsult SA, Wengistrasse 7, PO Box, 8026 Zürich

"Orconsult Ltd" / Respondent 16

**Respondents 12 – 16 are represented by Directors Georges Philippe and Guido Banholzer, and Peter Schatz, Attorney at Law,  Kellerhals Hess Rechtsanwaelte, Raemistrasse 5, 8024 Zurich**


LALIVE
Attorneys-at-Law

5

In compliance with the Arbitration Committee of the Swiss Chambers of Commerce and Industry's letter of 5 February 2008, the Claimants show herebelow the arbitration agreements each of them is bound to.

## I. CONTRACTUAL RELATIONSHIPS REGARDING DONATIONS AND ESCROWS

### I.1. The Donations of December 1998

1.    It is recalled here that the entire dispute relates to the implementation of two irrevocable donations by Angela Blickle in December 1998 (Exhibits C-1 and C-32 hereto), which she made before the Jersey Trusts Alsam, Colleen and Logany Settlements (see **Respondent 3**) were established.

2.    With the Donation Agreement of 16 December 1998 (Exhibit C-1), Mrs Angela Blickle irrevocably donated USD 24 million to charitable Foundations (below, # I.2.). In order for this donation to be implemented, Mrs Angela Blickle provided the Irish company Madison to be the escrow agent for this amount. Madison was formed in summer of 1998 and belonged to the Blickle Family. It held accounts at the two Swiss banks Darier Hentsch and UBS.

3.    With a further contract of December 1998 (Exhibit C-32) Angela Blickle donated an additional USD 12 Mio which was put in escrow with Albe Associated Limited (see below, # I.4).

4.    This first structure has been thereafter elaborated in various corporate entities, any and all of them being part and parcel of the initial structure provided for in the Donation Agreement. As a consequence, all entities and individuals connected to this elaborated structure are bound to the obligations contained in the Donation Agreement, and in particular to the arbitration agreement contained therein, as it is shown below (# I.2).

### I.2. The Donation Agreement (Claimant 1 and successors to Madison)

5.    **The Donation Agreement of 18 December 1998** (The Donation Agreement, Exhibit C-1) was entered into by and between A. Blickle (today deceased), the Irish Companies Millenium, First Aim and **Madison Corporate Developments Limited (Madison)** (the Escrow Agent) (Exhibit C-1, article 2) "Médecins avec Frontières" ("the Irish Companies") represented by Marco Stoffel and **Borderline Foundation in Formation (BPD Foundation)** (the Principal).

6.    The Donation Agreement provided for Claimant 1, Marco Stoffel, to " act as *"Protector.. to supervise the trustees in general and in particular as to the implementation of the donation. Dr Stoffel is also to serve as director of the foundation to put together a BPD research initiative and to assure the donor that*

LALIVE                                                                    6
Attorneys-at-Law

_____

*the moneys are well spent. Dr Stoffel is to be remunerated at DM 1,3 Mio as this represents his average income as an attorney"*

7.    The Donation Agreement provided for an arbitration clause binding upon any and all trusts (including trustees, **protectors** and beneficiaries, officers and directors of the entities) as well as their successors as follows:

*"All relationships of our family, the trusts (including trustees, protectors and beneficiaries) and its various entities with the officers and directors of the entities as well as with the foundation are subject to Swiss law. All successors of these persons and entities are bound by this agreement. Exclusive jurisdiction falls to arbitration in Zurich, according to the rules of the Zurich Chamber of Commerce including the mandatory submission to its Mini Trial. The parties expressly waive their right of appeal"*

8.    **As a result of these provisions, the Donation Agreement and the arbitration clause contained therein is binding in particular upon Marco Stoffel (Claimant 1) in his capacity as (a) Protector and (b) Director of the BPD Foundation, on the one hand, and Madison, in the latter capacity of Escrow Agent, on the other hand, as well as on any and all successors of these parties.**

9.    **The Escrow Confirmation of 15 January 1999** executed by Madison as Escrow Agent (Exhibit C-2) confirmed Madison as escrow agent as per the Donation Agreement mentioned above . The Escrow Confirmation contains the following arbitration clause:

*"Any successors to the Principals and/or the Escrow Agent are bound by the rights and duties stipulated in this agreement. In case of disputes an arbitration tribunal is set up according to the rules of the Zurich Chamber of Commerce and the seat of the arbitration tribunal shall be Zurich/Switzerland. The parties expressly waive their right to appeal the arbitration award".*

10.    **Thus, it is clear that any and all successors to the Parties to the Escrow Confirmation are bound to the arbitration clause mentioned.**

**I. 3. The Adoptation of 29 January 2001 of Escrow Confirmation (Claimant 1, Respondents 1,2 and 10 and successors companies Respondents 3-9 and 11,16)**

11.    **By an agreement** dated January 29,2001 by and between Maytown Universal SA (Maytown) & Plimpton Universal SA (Plimpton) and Colleen Investment AG (Colleen AG)    & Colleen Investment LLC (Colleen LLC), **(the Adoptation of Escrow Confirmation)    (Exhibit C-3), Maytown and Plimpton succeeded Madison as escrow agent under the Escrow Confirmation of 15    January 1999.**

LALIVE
Attorneys-at-Law

7

12. Moreover, the Adoptation of Escrow Confirmation stated that *"some of the money accounts have been transferred to the accounts ...Maytown and Plimpton"* and that *"transfers were made from these two accounts of Maytown and Plimpton to the account of Colleen Investment LLC with Bankers Trust"...or with Logany LLC",* and further, that:

   .*" The Escrow Confirmation of 1.15.1999 forms an integral part of this Agreement. "Any successors to the Principal and/or Escrow Agent are bound by the rights and duties stipulated herein; Disputes under this Agreement are subject to arbitration according to the rules of Zurich Chamber of Commerce, the seat of the arbitration tribunal being Zurich, Switzerland. The parties expressly waive their right to appeal the arbitration award"*

13. **As a result of the three agreements mentioned above (# I.1., I.2 and I.3), Marco Stoffel (Claimant 1) on the one hand, and Maytown (Respondent 1) Plimpton (Respondent 2) and Colleen LLC (Respondent 10) are bound to the Donation Agreement (and the Escrow Confirmation) and the arbitration clause provided therein in their capacity as:**

   **(i)    Protector and Director (Claimant 1)**
   **(ii)   Successors to Madison as escrow agents (Respondents 1, 2 and 10)**

14. Likewise, and as it will be demonstrated further during the arbitration proceedings, Respondents 3 to 9 and Respondents 11 and 16 are equally bound to the arbitration clause contained in the Adoptation inasmuch as there are successors to the Parties mentioned above

**I.4.  The Albe Escrow regarding the Donation Agreement re USD 12 Mio made part of the Madison Escrow (Claimants 1 and 2 and Respondent 13 plus its successors Respondents 12 and 14 and Respondents 15 and 16)**

15. The Arbitration Clause in the Escrow Confirmation (Exhibit C-2) and in the Adoptation Agreement binds Respondents Albeag Foundation (Albeag)(Respondent 12), , Albe Associates Limited (Albe) (Respondent 13), Bluecolt Securities (Bluecolt) (Respondent 14) , Orconsult SA and Orconsult Ltd **(Respondents 15 and 16)** for the following reasons:

   (i) Clarissa and Cedrick Blickle signed the Escrow Confirmation of 5 January 1999 (Exhibit C-2, initials) and they are the beneficial owners of Albe (Exhibits C-28 and C-29 hereto);

   (ii) ) The Albe Escrow was made part of the Escrow Confirmation as evidentiated

# L A L I V E
### Attorneys-at-Law

8

---

by the Confirmation issued by Alsam AG and Logany AG on 25 April 2005 (Exhibit C-30 hereto) as follows: :

*"Die daraus enstehenden Unter-Depots bei Colleen-Konti und –Immobilienfonds sowie bei Lauramca, Albe und Stoffel unterliegen deshalb auch den rechten und Pflichten in den Schenklungs- und escrow-Vereinbarungen."*

(iii) Albe is holding its assets for Bluecolt as shown by Albe letter to Bluecolt Securities Corp. of 17 October 2005 (Exhibit C-31 hereto). As a consequence, Bluecolt is a successor to the Escrow Confirmation as well.

(iv) Albeag Foundation became shareholder of Albe and Bluecolt (Exhibit C-32 hereto) and is therefore bound as a successor to the Escrow Confirmation as well.

## II. CONTRACTUAL RELATIONSHIPS REGARDING EMPLOYMENT, MANAGEMENT AND FIDUCIARY POSITIONS

### II.1 The Employment Agreement (Claimant 1, Respondents 9, 10 and 11)

16. By an additional **Employment Agreement dated 23 September 2004** between Marco Stoffel on the one hand (the Employee) and Colleen Investment AG and its subsidiaries Colleen Investment LLC and Logany LLC (**the Employment Agreement**) (Exhibit C5,C5/A,C5/B, C5/C), Claimant 1 was to receive a salary of USD 350'000 per year and had to be reimbursed for all expenses resulting from legal proceedings in connection with his employment.

17. The Employment Agreement provided for an arbitration clause as follows

*" The Agreement is exclusively subject to Swiss law, the place of arbitration being Zurich.*
*" Any claim of controversy that arises out of or relates to this agreement, or the breach of it, shall be settled exclusively by arbitration in accordance with the rules of the Zurich Chamber of Commerce. The parties submit to the Mini Trial mediation process as provided but the Chamber appointing the President of the Chamber or a person designated by him as the Mediator. Should the mediation fail, each side appoints one arbitrator and the arbitrators appoint the Chairman. The parties expressly waive their right to appeal and thus the award is final."*

being again specified that:

*" The Companies rights and obligations under this agreement will inure to the benefit and be binding upon the Companies' preceding owners, its successors and assignees".*

18. **Thus the Employment Agreement and the arbitration clause contained therein are binding upon Claimant 1, Marco Stoffel, on the one hand, and Respondents 9, Colleen Investment AG and its subsidiaries Respondent 10, Colleen Investment LLC, and Respondent 11, Logany LLC.**

8

LALIVE

Attorneys-at-Law

9

---

### II.2.    The Fiduciary Agreements (Claimant 1, Respondent 3)

19.    Further, by three Fiduciary Agreements between Chiltern Trust Company Ltd (now Vistra Trust Company Ltd) (**Vistra**) (Claimant, Exhibit C- 27 hereto) as Trustees of the Colleen Settlement (the Principal) and Marco Stoffel in his capacity as fiduciary shareholder and   Member of the Board of Directors of (a) **Colleen Investment AG** (Exhibit C-6); (b) **Logany Equity AG** (Exhibit C-7) and (c) **Alsam Holding AG and Penny Asset AG** (Exhibit C-8) dated 5 January 1999 (**The Fiduciary Agreements**) undertook to act according to the instructions of the Principal. The latter (**Vistra**) undertook in particular to " *meet without reservation and in their entirety all liabilities, costs and other financial duties and obligations the Trustee might incur because of the Activity*".

20.    Besides. these Fiduciary Agreements each provided that the fiduciary Agent was to receive a sum of CHF 30'000.- as compensation for his functions, additional services and expenses to be reimbursed separately.

21.    The three Fiduciary Agreements contained the following dispute resolution clause:

> "*This Agreement is exclusively subject to SWISS LAW.*
> *In the event of a dispute between the parties in connection with this Agreement the parties will submit to the arbitration proceeding according to the rules of the Swiss Code on International Private Law, the place of arbitration being Zurich*"

22.    **Thus Vistra (Respondent 3) and Marco Stoffel (Claimant 1) are bound to the three Fiduciary Agreement of 5 January 1999 and to the arbitration clause contained therein**

### II.3.    The Trust Agreements (Claimant 1, Respondents 4, 5, 6, 7, 8, 9 and 16)

23.    By two Trust Agreements of January 20 2000 (Exhibit C-9 and C-10)entered into by and between Orconsult Ltd (**Orconsult Ltd**) (in its capacity as Trustee to Aquarius Trust and Capricorn Trust) (the Principal) on the one hand, and Marco Stoffel in his capacity as fiduciary shareholder and Member of the Board of Directors of **Alsam Holding AG** and its subsidiaries **Colleen Investment AG and Penny Asset AG** , as well as of **Logany Equity AG** and its subsidiaries **Clarick AG und Vierwaldstätter Beteilungen AG** (Exhibit C-10), undertook to act according to the instructions of the Principal. The latter (**Orconsult**) undertook in particular to " *assume and pay at first request the Trustee's expenses from any legal proceedings with regard to his Activity…* ".

24.    Besides. these Trust Agreement provided that the fiduciary agent was to receive a sum of CHF 30'000.- from Alsam Holding and CHF 20'000.- from each of Collleen Investment AG and Penny Asset AG (Exhibit C-9) and from Vierwalstätter Beteiligungen AG and Clarick AG (Exhibit C-10) as compensation for his functions, additional services and expenses to be reimbursed separately.

LALIVE                                                                    10
Attorneys-at-Law

25.    It has to be underscored here that the control of all the Swiss Companies mentioned
       of which Marco Stoffel was a Board Member have been taken up by entities and/or
       individuals through a Shareholder General Meeting on December 6 2006, where
       none of the attendees and purported shareholders in fact had possession of the
       respective companies bearer shares. On December 6 2006, all of the companies'
       bearer shares were legally in the physical possession of Marco Stoffel. Thus the
       purported shareholders meeting of December 6 2006 was unauthorised and illegal.
       Annulment proceedings (art. 706 CO) are pending in this respect.

26.    The Trust Agreements contained the following dispute resolution clause:

       *"This Agreement is exclusively subject to SWISS LAW, the place of arbitration being
       Zurich.*
       *" In the event of a dispute between the parties in connection with this Agreement the parties
       will submit to the arbitration proceeding according to the rules of the Zurich Chamber of
       Commerce, each party appointing one arbitrator and the two arbitrators appointing the
       Chairman. The parties expressly waive their right to appeal and thus the award is final".*

27.    **Thus Orconsult Ltd (Respondent 16), Alsam Holding AG (Respondent 4),
       Colleen Investment AG (Respondent 9), Penny Asset AG (Respondent 5)
       Logany Equity AG (Respondent 6) as well as its subsidiaries Clarick AG
       (Respondent 8) and Vierwaldstaetter Beteiligungen AG (Respondent 7), on the
       one hand and Marco Stoffel (Claimant 1) are bound to the two Trust
       Agreements of 20 January 2000 and to the arbitration clauses contained
       therein.**

II.4.   **The Managing Directors Agreements (Claimant 1, Respondents 4,5,6
        and 9)**

28.    By three Managing Director Agreements entered into by and between:

       (i)     Angela Blickle on the one hand (*Geschäftsführer*) , and Alsam Holding
               AG (**Alsam**) on the other hand ( *Geschäftsinhaber)* (Exhibit C-11);
       (ii)    Clarissa Blickle on the one hand (*Geschäftsführer* ) and Logany Equity AG
               (**Logany AG**) on the other hand *Geschäftsinhaber* (Exhibit C-12);
       (iii)   Cedric Blickle on the one hand (*Geschäftsführer* ) and Colleen Investment
               AG (**Colleen AG**) and Penny Asset AG on the other hand
               (*Geschäftsinhaber*) (Exhibit C-13),

       the *Geschäftsinhaber*, represented by Marco Stoffel, assumed any and all
       responsibility for the companies concerned.

29.    The control of all the companies identified as *Geschäftsinhaber* in the three
       Managing Directors Agreements have been taken over by entities or individuals
       through general assembly meetings where the bearer shares, in the possession of
       Claimant 1, were not represented. In clear words, the control has been taken over in
       a totally illegal manner. As already mentioned, annulment proceedings are pending
       in this respect.

L A L I V E
Attorneys-at-Law

11

---

30.  Claimant 1 contends and holds that the newly controlled *Geschäftsinhaber* are liable towards him of various discharges in his capacity of directors of these   companies.

31.  The three Managing Director Agreements contain the following dispute resolution clause (in free translation):

> *"This agreement is subject to Swiss law. In case of disputes, an arbitration proceeding according to the Rules of the Zurich Chamber of Commerce is to be held. The seat of the arbitral Tribunal is Zurich. A sole arbitrator is appointed; If the Parties do not agree on the person of this sole arbitrator, the President of the Zurich Chamber of Commerce appoints this sole arbitrator. The Parties expressly waive an appeal against the arbitral award"*

32.  **Claimant 1 is therefore clearly bound to resolve disputes arising out from these three Managing Directors Agreements with**

   **(i)    Alsam AG (Respondent 4);**
   **(ii)   Logany AG (Respondent 6)**
   **(iii)  Colleen AG (Respondent 9)**
   **(iv)   Penny AG (Respondent 5)**

   **through arbitration in Zurich.**

---

**III.    CONTRACTUAL RELATIONSHIPS REGARDING LOANS**

**Loans to Marco Stoffel and/or Lauramca (Claimants 1 and 2, Respondent 15)**

33.  On 28 January 2003, and 16 December 2005 respectively, Orconsult SA granted various loans to Marco and Sue Stoffel as well as to Lauramca Holdings LLC (Exhibit C-14; Exhibit C-15). Theses loans were made and confirmed through Agreements (2) executed by Marco Stoffel on the one hand, and Orconsult SA on the other hand.

34.  These agreements contain the following identical dispute resolution clause:

> *"All disputes arising out and in connection with this agreement shall be finally settled according to the conciliation and arbitration rules of the Swiss Chamber of Commerce, Zurich"*

35.  **One is bound to conclude therefore that any and all disputes relating to these loans must be resolved through arbitration in Zurich.**

LALIVE
Attorneys-at-Law

12

## IV.    CONTRACTUAL RELATIONSHIPS REGARDING RELEASES AND WAIVERS

### Discharges (Claimant 1, Respondent 1)

36.    Besides and in connection with Marco Stoffel's roles for Charities and Trusts assets, various discharges have been issued by the Blickle Family (Exhibits C-16, C-17). These declarations, directly connected to Marco Stoffel's obligations vis-à-vis (in particular) **Maytown (Respondent 1)** (Exhibit C-17) contain an arbitration clause as follows:

*" This agreement shall be governed in all respects by SWISS LAW.  In the event of a dispute between the parties in connection with this Agreement the parties will submit to the arbitration proceeding according to the rules of the Swiss Code on International Private Law, the place of arbitration being Zurich. An arbitration tribunal of three arbitrators is to be formed.  The rules of the Zurich Chamber of Commerce apply including Mini Trial.  The Depositors and the Escrow Agents each appoint one arbitrator.  In case one or both sides cannot agree on their on arbitrators, the Chambers President appoints him.  The two party arbitrators elect the Chairman of the arbitration tribunal.  The parties expressly waive their right to appeal against the arbitration award".*

* * * *

We obviously remain at your disposal for any additional information you might need and remain

Yours sincerely

Christiane de Senarclens

Teresa Giovannini

Exhibits

12

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a true and correct copy of the foregoing Motion For Leave

To Submit Supplemental Memorandum Of Law, Supplemental Memorandum of Law In Further

Support of Motion to Dismiss, Declaration of John Fellas In Support of the Supplemental

Memorandum Of Law, and Declaration of Francois Knoepfler all dated March 25, 2008, to be served

by Federal Express this 25 day of March, 2008, to the following:

        Scott S. Balber, Esq.
        Chadbourne & Parke LLP
        30 Rockefeller Plaza
        New York, NY 10112

        Martin J. Murray, Esq.
        Law Offices of Martin J. Murray
        475 Park Avenue South, 23rd Floor
        New York, NY 10011

        ATTORNEYS FOR PLAINTIFFS VISTRA TRUST COMPANY (JERSEY) LIMITED
        AS TRUSTEE OF THE ALSAM; COLLEEN AND LOGANY SETTLEMENTS;
        COLLEEN INVESTMENT AG; ALSAM HOLDING AG; PENNY ASSET AG;
        LOGANY EQUITY AG; VIERWALDSTATTER BETEILIGUNGEN AG; CLARICK
        AG; COLLEEN INVESTMENT, L.L.C.; LOGANY, L.L.C.; AND WILLIAM
        TACON, RECEIVER AND MANAGER OF THE ASSETS OF MAYTOWN
        UNIVERSAL SA AND PLYMPTON UNIVERSAL SA

        I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 25, 2008
      New York, New York

                                         _____
                                         Hagit Elul