UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VISTRA TRUST COMPANY (JERSEY) LIMITED AS
TRUSTEE OF THE ALSAM, COLLEEN, AND
LOGANY SETTLEMENTS, COLLEEN INVESTMENT
AG, ALSAM HOLDING AG, PENNY ASSET AG,
LOGANY EQUITY AG, VIERWALDSTATTER
BETEILIGUNGEN AG, CLARICK AG, COLLEEN
INVESTMENT, L.L.C., LOGANY, L.L.C., and
WILLIAM TACON, RECEIVER AND MANAGER OF
THE ASSETS OF MAYTOWN UNIVERSAL SA AND
PLYMPTON UNIVERSAL SA,

                                        Plaintiffs,

                    -against-

DR. MARCO STOFFEL, ALBE ASSOCIATES
LIMITED, BLUECOLT SECURITIES CORPORATION,
LAURAMCA HOLDINGS, L.L.C., and JOHN DOES 1-10

                                        Defendants.

---

Index No. 08 CV 02844

**DECLARATION OF
PROFESSOR STEPHEN V.
BERTI**_____

PROFESSOR STEPHEN V. BERTI, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury under the laws of the United States of America as follows:

I.

1.  I was born on 23rd September 1956 in Carshalton (England) as a citizen of Great Britain and Switzerland (Calpiogna/TI), and educated at Reigate Grammar School, England, and at the University of Zurich, Switzerland, where I obtained a law degree (*lic. iur., magna cum laude*) in 1983 and a PhD (*dr. iur., magna cum laude*) in 1989.

2.  In 1989 I was admitted to the Zurich and Swiss Bars. Since then I have been a Lecturer for Civil Procedural Law and Arbitration Law at the University of Zurich and attorney-at-law in Zurich.

3.   In 2003 I became *dr. iur. habil.* of the University of Fribourg (Switzerland), where I had lectured in Civil Procedural Law since 1997. In 2005 I was made *Titularprofessor* of the University of Fribourg. In 2006 I was appointed Ordinary Professor for Civil Procedural Law and Civil Law at the University of Lucerne. I am co-editor of the *Swiss Journal of Civil Procedure* and of the *Zeitschrift für Schweizerisches Recht*, the current President of the Swiss Jurists' Association and Co-President of the Swiss Association of University Teachers of Civil Procedural, Arbitration and Insolvency Law.

4.   I have acted and act as arbitrator in over fifty domestic and international arbitrations in Switzerland, and am author and translator into English of several publications on Swiss and international arbitration law. In particular, in 2001 I translated, from German into English, the leading Swiss commentary on International Arbitration in Switzerland, to which I also contributed as an author. In 2007 my translation into English of the first nine chapters of the 2003 treatise in French on International Arbitration Law by POU-DRET/BESSON was published (cf. nos. 26 and 36 respectively of my list of publications, Exhibit B).

5.   I teach arbitration law to undergraduates at the University of Lucerne and, since 1996, to postgraduates of the LL.M. Course in International Law offered by the University of Zurich.

A more detailed *curriculum vitae* and my complete list of publications are appended to this Declaration as EXHIBITS A and B respectively.

## II.

6.   I have been provided with the Complaint filed on 21st December 2007 by the Plaintiffs and the further filings by the Parties which have taken place since then. Counsel for the Plaintiffs have asked me to specifically comment upon the Declaration of Messrs Fran-çois Knoepfler and Philippe Schweizer dated 26th February 2008 (hereinafter also referred to as "Knoepfler/Schweizer Declaration") and on letters from the Zurich Chamber of Commerce to Mrs. Teresa Giovannini dated 5th February 2008 and 10th March 2008 and signed by Dr. Lukas Briner. My comments and reasoning follow below.

**Summary of Main Conclusions:**

1. Under Swiss law, no party shall be considered lightly to have consented to arbitration (*infra sub* 11);

2. As a strict general *rule* the parties must reach agreement with regard to the exact nature of the dispute which they consent to submit to arbitration (*infra sub* 13). In the (statistically rare) cases of estoppel and intervention in contractual performance an non-signatory might *exceptionally* be bound to an exisiting and valid arbitration agreement. *In the material reviewed I found no trace of any such exception in the case at hand.*

3. In practice, a written arbitration agreement cannot constitute *prima facie* evidence of extension to non-signatory parties, since such extension can be established only by circumstances which are extraneous to a written agreement (*infra sub* 17);

4. An interpretation of the scope of an arbitration agreement under Swiss law must respect the strict rule that the specific nature of the dispute has to be covered by the formal requirement of written text (*infra sub* 20);

5. Where a plaintiff brings claims derived from various causes of action of which only some are included in the scope of the arbitration agreement, a court will *sever* those which are not; where one party makes a *prima facie* showing of fraud claims before a state court, the opposing party will be very hard pressed to show in good faith that the parties tacitly agreed to submit such claims to arbitration (*infra sub* 21);

6. A positive screening pursuant to art. 3 par. 6 of the Swiss Rules is a *nihil obstat* in the form of an administrative act. It binds neither courts in Switzerland nor elesewhere, nor the arbitrators (*infra sub* 24);

7.  An arbitral tribunal which has been constituted with its seat in Switzerland has the (non-exclusive) power to determine its jurisdiction, but its decision is subject to appeal to the Swiss Federal Tribunal, whose judgment is final (*infra sub* 25);

8.  No rule exists under Swiss law that an arbitral tribunal should take priority over a Swiss court where the determination of arbitral jurisdiction is at issue (*infra sub* 27 *et seq.*).

III.

8.  Starting point for any analysis of arbitration agreements under Swiss law is article 176 par. 1 of the Swiss Private International Law Statute of 18th December 1987 ("PILS"), which reads (my unofficial translation):

    > "The provisions in this chapter apply to arbitral tribunals which have their seat in Switzerland, provided at least one of the parties was neither domiciled nor resident in Switzerland at the time of the conclusion of the arbitration agreement."

9.  An arbitration with seat in Switzerland is thus only *international* in the meaning of art. 176 par. 1 PILS and accordingly subject to the provisions of Chapter Twelve of the PILS (artt. 176-194) provided that at the time of the conclusion of the agreement to arbitrate at least one of the parties had its domicile or place of residence outside Switzerland. Knoepfler and Schweizer confine themselves to a discussion of agreements to submit to international arbitration in the meaning of art. 176 par. 1 PILS,[1] and I shall do likewise.

10.  Article 178 PILS[2] deals with the agreement to arbitrate and reads (my unofficial translation):

     > "(1) The arbitration agreement must be in writing, by telegram, telex, telefax or in some other form of communication allowing the agreement to be evidenced by a text.
     > (2) The arbitration agreement is materially valid provided it conforms to the law chosen by the parties, to the law applicable to the dispute, in particular that applicable to the principal contract, or to Swiss law.
     > (3) It is no defence to the arbitration agreement to plead that the principal contract is invalid or that the arbitration agreement applies to a dispute which has not yet arisen."

---

[1] Where this is not the case, the Cantonal rules governing *domestic* arbitration apply (art. 176 par. 2 PILS).
[2] Curiously, Knoepfler and Schweizer do not cite article 178 PILS until p. 9 of their Declaration, where they address exceptions to the strict rule which it posits.

11. Shortly after the PILS came into force on 1st January 1989 the Swiss Federal Tribunal, which is the highest Swiss court, held in a judgment rendered on 15th March 1990 and reported in **DFT**[3] **116 Ia 58** that no party shall be considered lightly to have consented to arbitration. It said (my unofficial translation):[4]

> "By agreeing to arbitrate the parties waive the resolution of possible disputes by state courts, and such waiver is of considerable consequence in view of the limited possibilities of appeal and costs that are often significantly higher compared with those incurred in state court proceedings; *therefore, where the existence of such agreement is denied, it should not be assumed lightly.* On the other hand, once it is established that such agreement was reached, there is no longer any need for a restrictive interpretation; on the contrary, it may then be taken that the parties, given that they have agreed to arbitration, wish for a comprehensive jurisdiction of the arbitral tribunal." (*emphasis* supplied)

12. The Federal Tribunal reiterated this approach in a judgment rendered on 16th October 2001, reported in **DFT 128 III 50** (my unofficial translation):[5]

> "It must be pointed out here that Constitutional Law (in Switzerland art. 30 par. 1 Federal Constitution) and Public International Law Treaties (cf. art. 6 par. 1 European Human Rights Convention) guarantee all natural persons and legal entities the right to a trial before a court constituted pursuant to the law. By concluding an arbitration agreement, the parties waive such guarantee ([references]). *Since it is a question of waiving a constitutional guarantee, it should not be admitted lightly that arbitration has been agreed upon if this is contested* ([references]). Rather, it has to be established that there exists an agreement to arbitrate which is binding on all the parties to the arbitral proceedings, since it is only when this is the case that the parties can be required to bear the consequences of their choice (particularly the limited possibilities of appeal)." (*emphasis* supplied)

13. The parties must reach agreement with regard to two *essentialia negotii*: <u>first</u>, the exact *nature* of the dispute which they, <u>secondly</u>, consent to submit to *arbitration* (**DFT 130**

---

[3] DTF = <u>D</u>ecisions of the (Swiss) <u>F</u>ederal <u>T</u>ribunal, Official Reports, since 1874.

[4] In the German original: *"Mit einer Schiedsvereinbarung verzichten die Parteien auf die Entscheidung allfälliger Streitigkeiten durch staatliche Gerichte, ein Verzicht, dem angesichts der damit verbundenen Einschränkung der Rechtsmittelwege und angesichts der im Vergleich zum staatlichen Verfahren regelmässig bedeutend höheren Kosten des Schiedsverfahrens eine erhebliche Tragweite zukommt; dass eine solche Vereinbarung getroffen worden ist, darf daher im Streitfall nicht leichthin angenommen werden. Steht hingegen das Vorliegen einer Schiedsabrede fest, so besteht kein Anlass zu einer besonders restriktiven Auslegung mehr; diesfalls ist im Gegenteil davon auszugehen, dass die Parteien eine umfassende Zuständigkeit des Schiedsgerichts wünschen, wenn sie schon eine Schiedsabrede getroffen haben."* For a further confirmation see **DFT 129 III 680 et seq., cons. 2.3.**

[5] In the French original: *"C'est le lieu de rappeler que le droit constitutionnel (pour la Suisse, cf. art. 30 al. 1 Cst.) et le droit conventionnel (cf. art. 6 par. 1 CEDH [RS 0.101]) garantissent à toute personne, physique ou morale, le droit à ce que sa cause soit entendue par un tribunal établi par la loi. En concluant une convention d'arbitrage, les parties renoncent à cette garantie ([references]). S'agissant de déroger à une garantie de rang constitutionnel, on se gardera d'admettre trop facilement qu'une convention d'arbitrage a été conclue, si ce point est contesté ([references]). Il importe, bien plutôt, de s'assurer qu'il existe une convention d'arbitrage susceptible d' être opposée aux parties à la procédure arbitrale, car ce n'est qu'à cette condition que l'on peut exiger de celles-ci qu'elles assument les conséquences de leur choix (notamment la limitation des possibilités de recours)."*

**III 70, cons. 3.1**). Such agreement on both these points must be covered by the formal requirement of written text set out in art. 178 par. 1 PILS. A signature is not necessary.[6] That is the - strict - *rule*.

14. Once such formal agreement has been established, as a second step the material validity of the agreement must be determined. Under Swiss law the agreement will be materially valid if this would be the case under any one of the three laws specified by Art. 178 par. 2 PILS (i.e. the law chosen by the parties, that applicable to the dispute, in particular that applicable to the principal contract, or Swiss law). It is only with regard to this second step, with its threefold possibilities, that Swiss law can be said to lean *in favorem validitatis*.

15. The Swiss Federal Tribunal has held that the rule may suffer *exceptions* where agreement to arbitration is deemed sufficiently material as to override the lack of fulfilment of the formal requirement of a written text. Knoepfler and Schweizer address such exceptions under the general heading *"Application of an arbitration agreement to non-signatories"*[7] (Knoepfler/Schweizer Declaration, p. 7 et seq.), where they discuss the specific instances of assignment of the contract, universal succession and *"other circumstances"* (Knoepfler/Schweizer Declaration p. 9 et seq.[8]) which relate to estoppel and intervention in contractual performance.

16. In substance I would qualify neither universal succession nor assignment of a contract as exceptions to the formal requirement of written text. Universal successors "step into the shoes" of their predecessors. They are bound by them in the same way as a principal is bound by his agent.[9] Assignment, too, must be done in writing under Swiss law.[10] Knoepfler and Schweizer cite (Declaration p. 7 et seq.) three cases where purported assignment failed to extend an arbitration clause to a third party.

---

[6] Cf. the unreported judgment of the Swiss Federal Tribunal of 7th August 2001, **4P.124/2001**, cons. 2 c: *"Quant à la forme, l'art. 178 al. 1 LDIP n'exige pas que la convention d'arbitrage soit signée."*

[7] While non-signatories is a misnomer in the absence of the requirement of a signature (cf. *supra sub* 13), the term is retained here.

[8] Curiously, it is only at this point that Knoepfler and Schweizer cite art. 178 PILS. As described in the forgoing text, this fundamental norm is of general application and posits a strict rule.

[9] Decision of the Swiss Federal Tribunal of 19th May 2007, **4C.40/2003**, cons. **4.1** *in fine*.

[10] Decision of the Swiss Federal Tribunal of 11th April 2007, **4P.32/2007**, cited in the Knoepfler/Schweizer Declaration at p. 8.

17.  By contrast, the statistically rare cases of estoppel and intervention in contractual per-
formance *do* constitute exceptions to the strict formal requirement of written text de-
scribed above (*supra* 13). *In the material I have reviewed I found no trace of any such
exception in the case at hand.* Of course, a written arbitration agreement cannot con-
stitute *prima facie* evidence of extension to non-signatory parties, since such extension
can be established only by circumstances which are extraneous to a written agreement.

18.  Knoepfler and Schweizer (Declaration, p. 11) write that in a recent case[11] *"the Federal
Tribunal held that the protectors and the beneficiaries of a trust were free to arbitrate
about the disputes arising out of or in connection with the trust, although third parties
were also involved in the dispute, in particular the Swiss tax administration."* This
statement requires qualification. In the case in question the son and the second wife of
the (since deceased trustee), each of whom was both a beneficiary and a protector of the
trust in question, had concluded a specific agreement by which the son paid his step
mother a certain sum in consideration of her renouncing her rights as a beneficiary.
That agreement contained an arbitration clause. The parties' dispute concerned the que-
stion of the apportionment *inter partes* of tax imposed on the consideration received.
The Swiss tax administration was *not* directly involved in the case; rather, the parties
were attempting to clarify the effects of taxation on their internal relationship. Since the
dispute fell under their *specific* arbitration agreement, it is difficult to see how the case
can be said to support the much broader contention made by Schweizer and Knoepfler.

19.  In fact, trust arbitration in Switzerland is hitherto an almost completely unexplored
field.[12] In the same paragraph from which the words cited above were taken (Declara-
tion p. 11), Knoepfler and Schweizer proceed to quote "more generally" Tina Wtister-
mann [*sic; recte* Wüstemann] who considers Switzerland to be a suitable venue for trust
arbitration. In order to avoid any misapprehension, I must point out that Mrs. Wüste-
mann is not, as the context might imply, a Swiss Federal Judge, but an arbitration prac-
titioner. In the paper[13] from which Knoepfler and Schweizer quote Mrs. Wüstemann
concedes that *"one may come to the conclusion that some types of trust disputes may*

---

[11] **4A_220/2007.**
[12] Switzerland only recently ratified the Hague Convention on Trusts (with effect as of 1st July 2007).
[13] Tina Wüstemann, Arbitration of Trust Disputes, in: Chr. Müller (ed.), New Developments in International
Commercial Arbitration, Zurich 2007, p. 33 et seq.

*not be suitable for arbitration and should be better referred to state courts"* and points out the manifold practical difficulties of reaching binding agreements to arbitrate in a trust context. [14]

20. With respect to the *scope* of arbitration agreements, the Knöpfler/Schweizer Declaration refers (at p. 4) to the holding of the Swiss Federal Tribunal in **DFT 116 Ia 56** (*supra sub* 11) to the effect that once it is established that such agreement has been reached, there is no longer any need for a restrictive interpretation. Nonetheless, any interpretation must respect the rule that the specific nature of the dispute is one of the two *essentialia negotii* which must be covered by the formal requirement of written text in order for the agreement to be valid (*supra sub* 13).

21. I agree with the Knoepfler/Schweizer Declaration (p. 3) that if the will of the parties is not immediately apparent from the words they agreed to use, courts or arbitrators must interpret those words as they would be understood by a person acting in good faith taking all the circumstances into account.[15] If the parties have referred to any disputes *"in connection with their contract"*, it will be reasonable to infer that their intention was to include disputes as to whether such contract was validly concluded. However, under Swiss law there is no presumption of a general extension to *non-contractual* claims. Where a plaintiff brings claims derived from various causes of action of which only some are included in the scope of the arbitration agreement, a court will sever those which are not. *There is under Swiss law no doctrine of creating arbitrability by "intertwining" non-arbitrable claims with arbitrable ones.* And where one party makes a *prima facie* showing of fraud claims before a state court, the opposing party will be very hard pressed to show in good faith that the parties tacitly agreed to submit such claims to arbitration.

---

[14] Wüstemann, op. cit. (previous footnote), 44 et seq.
[15] Cf. **BGE 130 III 71 cons. 3.2.**

IV.

22. I understand that in the present case the Defendants in the New York proceedings are seeking to institute arbitration proceedings under the auspices of the Zurich Chamber of Commerce pursuant to the Swiss Rules. On 5th February 2008 Dr. Lukas Briner of the Zurich Chamber of Commerce wrote to Mrs. Teresa Giovannini, Swiss counsel for the Defendants in the New York Proceedings. He pointed out that a Notice of Arbitration should include a copy of the arbitration clause or separate arbitration agreement that is invoked, and invited Mrs. Giovannini to provide relevant particulars. By letter dated 10th March 2008 to *int. al.* Mrs. Teresa Giovannini, Dr. Lukas Briner wrote (at p. 2):

> "Pursuant to Claimants' submission, it seems that the arbitration clauses provided in the "Do-nation Agreement" (Claimants' Exhibit C1), the "Escrow Confirmation" (Claimants' Exhibit C2) and the Adoptation of Escrow Confirmation" (Claimants' Exhibit C3) are applicable to all the parties to this arbitration."

23. This passage reflects the result of what might be termed the "screening process" provided for by art. 3 par. 6 Swiss Rules, which stipulates:

> "The Chambers shall provide without delay a copy of the Notice of Arbitration and of any exhibits included therewith to the Respondent, unless the Chambers decide, after consultation with the Special Committee, that there is manifestly no agreement to arbitrate referring to these Rules."

24. The Swiss Federal Tribunal has held that if, following a positive screening, an arbitral institution appoints an arbitrator *in lieu* of a party which failed to do so, this too is a purely administrative act.[16] It follows that the same qualification applies to the act of screening. A positive screening is an administrative act bereft of any jurisdictional or evidentiary quality. It is merely a *nihil obstat,* which does not positively confirm the *prima facie* existence of an arbitration agreement, but rather *negates that there is any reason to refuse to give further effect to the Plaintiffs' Notice of Arbitration for lack of any semblance of an arbitration agreement.* It binds neither courts in Switzerland nor elsewhere, nor the arbitrators

25. An arbitral tribunal which has been constituted with its seat in Switzerland and which is confronted with a plea of lack of an arbitration agreement itself determines the question

---

[16] **BGE 118 II 361 cons. 3b.**

of its jurisdiction (art. 186 par. 1 PILS).[17] Its powers are in no way fettered by any administrative screening decision, *but* its jurisdictional decision is subject to appeal to the Swiss Federal Tribunal pursuant to art. 190 par. 1 lit. b and 191 PILS. Thus, it is the highest Swiss state court which finally decides if the party denying arbitral jurisdiction appeals to it.

26.   If a Swiss court is confronted by a plea of lack of jurisdiction based on an agreement to arbitrate in Switzerland, art. 7 PILS applies.[18] It reads (my unofficial translation):

> "If the parties have concluded an arbitration agreement concerning an arbitrable dispute, a Swiss court seized of such dispute shall decline jurisdiction unless:
> (1) the defendant has submitted without reservation to the proceedings;
> (2) the court finds that the arbitration agreement is null and void, inoperative or incapable of being performed, or
> (3) the arbitral tribunal cannot be constituted for reasons manifestly attributable to the defendant."

27.   The Swiss Federal Tribunal held in **DFT 127 III 285 cons. 2c ee** that there no rule exists under Swiss law that an arbitral tribunal should take priority over a Swiss court where the determination of arbitral jurisdiction is at issue:[19]

> "It is true that art. 186 par. 1 PILS empowers an arbitral tribunal to decide on its own jurisdiction. *This does not however mean that a state court seized of the same manner is deprived of the right to examine its own jurisdiction; neither can it be inferred that the state court is obliged to suspend its proceedings if they were commenced beforehand, and give priority to the arbitral tribunal.* Nonetheless, in view of this system the Federal Tribunal has held that the Swiss state courts should confine themselves to a *prima facie* examination of their jurisdiction where the seat of the arbitration is in Switzerland (DFT 124 III 139 consid. 2b). However, *this judgment does not concern any order of priority* but exclusively the extent of the powers of examination of the state courts." (all *emphasis* supplied)

---

[17] Similarly, art. 21 (1) of the Swiss Rules provides that "the arbitral tribunal shall have the power to rule on objections that it has no jurisdiction." As Berger writes in note 5 to art. 21 in the Commentary on the Swiss Rules of International Arbitration edited by Zuberbühler, Müller and Habegger and published in Zurich in 2005: *"Art. 21 (1) does not establish a priority of the arbitral tribunal to decide upon jurisdictional objections. This issue rather depends on the law applicable at the seat of the arbitration."* That is correct. For a demonstration that Swiss law does not establish a priority of the arbitral tribunal see *sub* 27 and 28 *infra*.

[18] If the alleged agreement provides for arbitration abroad, the Swiss court must apply art. II (3) New York Convention. Both provisions are similar, if not identical, in their material effect.

[19] In the French original: *"Il est vrai que l'art. 186 al. 1 LDIP donne au tribunal arbitral le pouvoir de statuer sur sa propre compétence. Cela ne signifie cependant pas qu'un tribunal étatique saisi de la même demande serait dépouillé du droit de statuer sur sa propre compétence; on ne peut pas non plus en déduire que le tribunal étatique serait obligé de suspendre sa procédure, si elle est antérieure, pour céder la priorité au tribunal arbitral. La jurisprudence a néanmoins tenu compte de cette conception, en affirmant que le juge étatique suisse devait se limiter à un examen sommaire de sa compétence lorsque le siège du tribunal arbitral se trouve en Suisse (ATF 124 III 139 consid. 2b). Cet arrêt ne concerne cependant pas un ordre de priorité pour statuer, mais exclusivement l'étendue du pouvoir d'examen appartenant au juge étatique."*

28. In a further judgment rendered in 2004[20] the Federal Tribunal held that a Swiss court cannot only decline jurisdiction, but can also *assume* it on the basis of a *prima facie* finding that an alleged arbitration agreement is invalid.

29. Knoepfler and Schweizer cite neither of these cases, and they indeed even concede (Declaration, p. 6) that "theoretically" there is no priority of the arbitral tribunal to rule on its jurisdiction. However, they go on to allege that "the practical result is equivalent". This is untenable as a proposition of Swiss law given the existence of highest judicial authority to the contrary. [21]

* * *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 16th day of April 2008

*(signature)*

Professor Stephen V. Berti

EXHIBIT A - *curriculum vitae*

EXHIBIT B - Complete list of publications

---

[20] **4P.114/2004 cons. 7.3.**: *"In altre parole, se l'esame sommario rivela uno di questi vizi, il giudice statale deve ammettere la propria competenza"* = (my unofficial translation) "In other words, if the summary examination reveals one of these deficiencies [i.e. as set out in art. 7 PILS], the state court shall take jurisdiction."

[21] Knoepfler and Schweizer also suggest (Declaration, p. 14), albeit less affirmatively, that Swiss law *tends* to favor the priority jurisdiction of arbitrators to rule on their own jurisdiction. As has just been shown, this is not the position of the Swiss Federal Tribunal.

**EXHIBIT A**

# Prof. Dr. iur. Stephen V. Berti

Attorney at law

***Ordinarius for Civil Procedural Law, Arbitration Law and Civil Law
at the University of Lucerne
Professeur titulaire at the University of Fribourg***

Gstadstrasse 21

CH-8702 Z o l l i k o n

Switzerland

Tel. +41 79 403 23 26
dr.berti@cyberlink.ch

## *Curriculum vitae*

Born 23rd September 1956 in Carshalton (England). Citizen of Great Britain and Switzerland (Calpiogna/TI). Educated at Reigate Grammar School and University of Zurich.

| | |
|---|---|
| 1975-1978 | Commercial Apprenticeship, Swiss Bank Corporation, Zurich |
| 1978-1983 | Undergraduate law studies, University of Zurich |
| 1983 | *lic. iur., magna cum laude,* University of Zurich |
| 1989 | *dr. iur., magna cum laude,* University of Zurich |
| 1989 | Admitted to Zurich and Swiss Bars |
| 1984-1991 | Assistant to Prof. Dr. Dr. h.c. mult. Walther J. HABSCHEID, University of Zurich (full time 1984-1986, part time 1987-1991) |
| since 1989 | Lecturer at the University of Zurich for Civil Procedural Law and Arbitration Law |

| | |
|---|---|
| since 1990 | Advocate in Zurich (where not otherwise stated below: in own practice) |
| 1991 - 1994 | Partner, Schraner & Berti, Zurich |
| 1994 - 1999 | Partner, Prager Dreifuss, Zurich |
| since 1996 | Lecturer on the postgraduate LL.M. programme of the University of Zurich (Internationales Wirtschaftsrecht) for International Arbitration Law |
| since 1997 | Lecturer in Civil Procedural Law, University of Fribourg (Switzerland) |
| since 2002 | Co-president, Swiss Association of University Teachers of Civil Procedural, Arbitration and Enforcement Law |
| 2003 | *dr. iur. habil.,* University of Fribourg (Switzerland), with *venia legendi* for Civil Procedural Law, Private International Law and Law of Obligations |
| 2004 | Co-opted Member of the German Association of Professors for Procedural Law |
| 2005 | *Titularprofessor,* University of Fribourg (Switzerland)<br>Co-editor, Swiss Journal of Procedural Law<br>Co-editor, Zeitschrift für Schweizerisches Recht |
| since 2006 | Full Ordinary Professor, University of Lucerne (Switzerland)<br>President of the Swiss Jurists Association |

Arbitrator in over 50 international and domestic (Swiss) arbitrations. Author of numerous publications on Swiss and international arbitration law (see attached list of publications). Fluent in English, Italian, German and French.

April 2008

**EXHIBIT B**

# Prof. Dr. iur. Stephen V. Berti

Attorney at law

*Ordinarius for Civil Procedural Law, Arbitration Law and Civil Law*
*at the University of Lucerne*
*Professeur titulaire at the University of Fribourg*


Gstadstrasse 21
**CH-8702 Z o l l i k o n**

Tel. +41 79 403 23 26
dr.berti@cyberlink.ch


# List of Legal Publications

(excluding book reviews and speeches)

As of April 2008

(larger words in **bold type**, English publications in *italics*)


1.  **Zum Einfluss ungeschriebenen Bundesrechts auf den kantonalen Zivilprozess im Lichte der Rechtsprechung des Schweizerischen Bundesgerichts,** Dissertation Universität Zürich, Zürich 1989 (Zürcher Schriften zum Verfahrensrecht, Bd. 82)

2.  Zwei intertemporalrechtliche Probleme des neuen Rechts der internationalen Schiedsgerichtsbarkeit der Schweiz, in: Mitteilungen des Instituts für zivilgerichtliches Verfahren in Zürich, Nr. 7, Zürich 1989, 9 ff.

3.  Zur Frage des zeitlichen Anwendungsbereichs von Art. 176 Abs. 2 IPRG - Bemerkungen zu BGE 115 II 390 ff., in: Bulletin der Schweizerischen Vereinigung für Schiedsgerichtsbarkeit, 1990, 105 ff.

4.  Zur prozessualen Geltendmachung des Anspruches auf Ersatz des sog. mittelbaren Schadens im Schweizerischen Aktienrecht, in: Zeitschrift für Schweizerisches Recht, n.F. Bd. 109 (1990) I 439 ff.

5.  Zum Verhältnis zwischen materiellem Recht und Prozessrecht, in: Berti/Knellwolf/Köpe/Wyss, Beiträge zu Grenzfragen des Prozessrechts, Professor

Walther J. Habscheid zum Anlass seiner Emeritierung dargeboten von seinen Zürcher Assistenten, Zürich 1991 (Zürcher Schriften zum Verfahrensrecht, Bd. 94), 1 ff.

6.      Zum Ausschluss der Schiedsgerichtsbarkeit aus dem sachlichen Anwendungsbereich des Luganer Übereinkommens, in: Schwander/Stoffel (Hrsg.), Beiträge zum schweizerischen und internationalen Zivilprozessrecht, Festschrift für Oscar Vogel zum 65. Geburtstag, Fribourg 1991, 337 ff.

7.      Urteilsanmerkung zum Urteil der I. Zivilabteilung des Bundesgerichts vom 27. August 1991, Rechtssache 4C.179/1989 (Aktienrecht, Verantwortlichkeitsklage), in: Schweizerische Zeitschrift für Wirtschaftsrecht, 64 (1992) 74 ff.

8.      Das Lugano-Übereinkommen und die Ausdehnung des Europäischen Zivilprozessrechts, in: Der Schweizer Treuhänder, 1992, 198 ff.

9.      Zur einheitlichen Auslegung des Luganer Übereinkommens, in: Mitteilungen des Instituts für zivilgerichtliches Verfahren in Zürich, Zürich 1989, Nr. 14, Zürich 1991, 7 ff.

10.      Kommentierung der Art. 60, 67 und 127 - 142 OR: in Honsell/Vogt/Wiegand (Hrsg.), Basler Kommentar zu Art. 1 - 529 OR, 1 A., Basel 1992; 2. A., Basel 1996.

11.      Gedanken zum Begriff der Klageeinleitung vor schweizerischen Gerichten gemäss Art. 21 - 23 LugÜ, in: Meier/Riemer/Weimar (Hrsg.), Festschrift für Hans-Ulrich Walder zum 65. Geburtstag, Zürich 1994, 307 ff.

12.      Kommentierung der Art. 1069-71 und 1134 OR: in Honsell/Vogt/Wiegand (Hrsg.), Basler Kommentar zu Art. 530 - 1186 OR, 1 A., Basel 1994; 2. A., Basel 2002.

13.      Zur Unterbrechung der Verjährung durch Betreibung und Klage - oder die Alternativen zum „Inspired Guess", in: recht 1994, 76 ff.

14.      Der *Trust*, das Lugano Übereinkommen und das IPRG, in: Walder/Jaag/Zobl (Hrsg.), Festgabe zum Schweizerischen Juristentag 1994, Zürich 1994, 223 ff.

15.      Zur Anfechtung eines Schiedsentscheides wegen Unvereinbarkeit mit dem Ordre public nach Art. 190 Abs. 2 lit. e IPRG, in: Meier/Siehr (Hrsg.), Festschrift für Anton Heini zum 65. Geburtstag, Zürich 1995, 1 ff.

**16.**      **Kommentierung vor Art. 2 - 12 IPRG, 2 - 4 IPRG, 7 - 12 IPRG, 166 - 169 sowie 171 IPRG, 175, 183, 185 und 193 IPRG, ferner 25 - 32, 149, 190 und 191 IPRG (mit Anton K. Schnyder), 170 und 172 - 174 IPRG (mit Urs Bürgi), in: Honsell/Vogt/Schnyder (Hrsg.), Basler Kommentar zum IPRG, Basel 1996**

17.      „Der Erlass vorsorglicher Massnahmen ohne vorgängige Anhörung der Gegenpartei stellt eine äusserst einschneidende Massnahme dar ...,, , in: Kurer/

Ritscher/ Sangiorgio/Aschmann, Festschrift für Lucas David zum 60. Geburtstag, Zürich 1996, 265 ff.

18.    **Vorsorgliche Massnahmen im schweizerischen Zivilprozessrecht**, in: ZSR 1997 II 173 ff. (Referat zuhanden des Schweizerischen Juristentages 1997 in Lugano)

19.    *Swiss Debt Enforcement and Bankruptcy Law. English translation of the Amended Federal Statute on Debt Enforcement and Bankruptcy (SchKG) with an introduction to Swiss Debt Enforcement and Bankruptcy Law*, Zürich 1997

20.    Kommentierung der Art. 49 und 50 SchlT ZGB, in: Honsell/Vogt/Geiser (Hrsg.), Basler Kommentar ZGB II, Basel/Frankfurt am Main 1998

21.    Kommentierung des Art. 260 SchKG, in: Staehelin/Staehelin/Baur (Hrsg.), Basler Kommentar zum SchKG, Basel/Frankfurt am Main 1998

22.    (mit Christoph Graber) **Das Schweizerische Geldwäschereigesetz. Gesetzesausgabe mit englischer Übersetzung und Anmerkungen**, Zürich 1999

23.    Zur Rechtskraft negativer Prozessurteile, in: Haldy/Rapp/Ferrari (Hrsg.), Etudes de procédure et d'arbitrage en l'honneur de Jean-François Poudret, Lausanne 1999, 1 ff.

24.    Helvetisches Zivilprozessrecht - Was nun? in: Berti (Hrsg.), Helvetisches Zivilprozessrecht. Symposium zum 75. Geburtstag von Walther J. Habscheid, Bibliothek zur Zeitschrift für Schweizerisches Recht, Beiheft 31, Basel 1999, 19 ff.

25.    *Trusts and the Lugano Convention*, in: Vogt (Hrsg.), Disputes involving Trusts, Basel/Genf/München 1999, 9 ff.

26.    Editor, Contributor and Translator: *International Arbitration in Switzerland*, Basel/Geneva/Munich/The Hague/London/Boston 2000, 33 ff.

27.    Englische Anti-suit injunctions im europäischen Zivilprozessrecht - A Flourishing Species or a Dying Breed?, in: Basedow/Meier/Schnyder/ Einhorn/Girsberger (Hrsg.), Festschrift für Kurt Siehr zum 65. Geburtstag, Den Haag 2000, 93 ff.

28.    **[Zürcher] Kommentar zum Schweizerischen Zivilgesetzbuch. Obligationenrecht. Teilband V 1 h. Das Erlöschen der Obligation. Zweite Lieferung, Art. 127 - 142 OR, Zürich 2002.**

29.    Zur Gleichstellung von Schiedsverfahren und Gerichtsverfahren bei der Rechtshängigkeit. Anmerkung zu BGE 4P.37/2001 vom 15. Mai 2001, in: ZZPInt 6 (2001), 365 ff.

30.     *Translating the „Mareva" - The Enforcement of an English Freezing Order in Zurich,* in: Berti/Girsberger (Hrsg.), Festgabe für Anton K. Schnyder zum 50. Geburtstag, Zürich 2002, 1 ff.

31.     Baustelle Zivilprozessrecht - ein Augenscheinsbericht, in: Tercier/Amstutz/ Koller/Schmid/Stöckli (Hrsg.), Gauchs Welt. Festschrift für Peter Gauch zum 65. Geburtstag, Zürich 2004, 347 ff.

32.     Prozessentstehungs- und Sachbeurteilungsvoraussetzungen - Gedanken zu Art. 54 ff. des Vorentwurfs für eine Schweizerische Zivilprozessordnung, in: Jametti Greiner/Berger/Güngerich (Hrsg.), Festschrift für Franz Kellerhals zum 65. Geburtstag, Bern 2005, 253 ff.

33.     Vom Beruf unserer Zeit für zivilprozessuale Gesetzgebung, Zeitschriften und „doktrinäre Entspannung" - ein Plädoyer für den Rechtsschutzanspruch, in: SZZP 1 (2005) 67 ff.

34.     (In Co-autorenschaft mit DOMINIK INFANGER) Praktische Gedanken zur Frage der Kontrolle der Übernahme von Rechtswirkungen ausländischer Konkursdekrete in der Schweiz, in: Riemer/Kuhn/Vock/Gehri, Festschrift für Karl Spühler zum 70. Geburtstag, Zürich 2005, 35 ff.

35.     *Übersetzer* des englischen Textes von: Forstmoser/Sprecher/Töndury, Persönliche Haftung nach Schweizer Aktienrecht. Risiken und ihre Minimierung / *Personal Liability under Swiss Corporate Law. Associated risks and their avoidance,* Zürich 2005

*36.*     **Translator (into English) of the first 8 chapters (pp. 1 - 698) of Poudret/ Besson, *Comparative Law of International Arbitration,* (updated) 2nd edition, London 2007 (French original *"Droit comparé de l'arbitrage international",* published in 2002)**

37.     Gedanken zur Teil(anspruchs)klage nach Art. 84 E ZPO CH, in: SZZP 3 (2007) 77 ff.

**38.**     **Mitherausgeber und Kommentierung vor Art. 2 - 12 IPRG, 2 - 4 IPRG, 7 - 12 IPRG, 166 - 169 sowie 171, 183, 185 und 193 IPRG, ferner 25 - 32, 149, 190 und 191 IPRG (mit Robert K. Däppen), 170 und 172 - 174 IPRG (mit Urs Bürgi), in: Honsell/Vogt/Schnyder/Berti (Hrsg.), Basler Kommentar zum IPRG, 2. A., Basel 2007)**

39.     Der gerichtliche Vergleich, in: Fellmann/Weber (Hrsg.) HAVE Haftpflichtprozess 2007, Zürich 2007, 109 ff.

*40.*     *Are Anti-Suit Injunctions in Support of Arbitration compatible with EC Regulation 44/2001?* Some Thoughts on the Reference from the House of Lords to the European Court of Justice in *West Tankers v RAS Riunione Adriatica di Sicurtà Spa & others,* Mélanges Pierre Tercier, Zurich 2008, 739 ff.